## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

ADAM ROSS,                              )
                                        )
    Plaintiff.                     )
                                        )   **Case No: 1:18-cv-1258**
                                        )
VS.                                     )
                                        )
BALL STATE UNIVERSITY,                  )
                                        )
    Defendant.                     )


## COMPLAINT AND REQUEST FOR JURY DEMAND

PLAINTIFF, Adam Ross ("Ross"), by and through his attorneys, HOCKER &

ASOCIATES, LLC, by Brett E. Osborne, complains against Defendant, Ball State University, as

follows:

## THE NATURE OF THIS ACTION and RELEVANT FACTS

1. This case arises out of the actions taken and procedures employed by Defendant Ball

   State, concerning allegations made against and by Plaintiff, Ross, a male freshmen

   student at Ball State University as a result of the alleged sexual misconduct with and

   between fellow Ball State University female student, "Jane Doe" (who is well known to

   and by the Defendant, and will not be named to protect her privacy until and/or unless it

   is demanded by the Defendant, Ordered by the Court or becomes necessary in the

   prosecution of this case).

2. The sexual misconduct allegations by and between Ross and Jane Doe refer to events

   that occurred on the evening of September 18, 2015 and early morning hours of

September 19, 2015 in Jane Doe's dorm room on Defendant's campus, in the presence of her roommate, when Ross was taken to the room by and as a guest of Jane Doe.

3. On November 13, 2015, nearly two months later, Ross was first notified by Defendant of a Complaint made against him by Jane Doe of sexual misconduct, which included a no contact order involving a class they were and had been attending together the entire semester, without incident, including from the date of the alleged incident.

4. On November 20, 2015, Defendant's Title IX investigators, Tiffany Peters and Lauren Berger, interviewed Ross.

5. At the November 20, 2015 interview, Ross, at the advice of his Attorney, invoked his Fifth Amendment rights against self-incrimination as it was presumed illegal sexual contact was being alleged and had been reported to law enforcement personnel, a fact that was in fact true at the time of said questioning.   At the interview, Ross was not provided any statements made by Jane Doe or any other witnesses, despite the fact that they in fact had access to said statements, and was not advised that the Ball State University Police Department had already taken an initial report on the matter, and that Jane Doe had in fact made a statement to Officer Stephens of the Ball State University Police Department, despite Defendant initially possessing said information and forwarding it to the Police Department

6. On November 23, 2015, Defendant's Title IX investigators interviewed Jane Doe, in the presence of a Revolution Staff Member, that was counseling Jane Doe, for at least a second time, the prior being November 13, 2015, informing her of their specific discussions with Ross, including giving her access to his statement and asking for her response.

7.  Jane Doe's explicit initial preference for resolution of this matter was "to sit down with Ross for a mediation conversation".  However, The Defendant's Title IX investigators advised her "that would not be an appropriate resolution", and that suspension or expulsion from school may be the appropriate sanctions.  Thereafter, Jane Doe sought resolution consistent with the investigators recommendation.

8.  On or about December 3, 2015, Lauren Berger, Defendant's Title IX Investigator, issued her Final Report, providing Ross with a copy.

9.  After issuance of the Final Report, Ross was, for the first time, aware that the alleged event had already been reported to the Ball State University Police Department and that they had not investigated or acted upon the matter further despite being provided information from Jane Doe, including interviewing her.

10. Additionally, after reviewing the statements of Jane Doe and additional witnesses in the Final Report, which were not previously provided, it was determined that Ross could and wanted to give a more comprehensive statement of the events, as he believed that exercising his Constitutional Rights to remain silent, were being used adversely against him in the proceeding.

11. Thereafter, Ross gave a supplemental statement to Defendant's Title IX Investigators, Lauren Berger and Tiffany Peters and Michael Gillilan, Director, Student Rights and Community Standards.

12. On March 24, 2016, Michael Gillilan advised Ross that he had been charged with violations of the Code of Student Rights and Responsibilities, Sections 5.1.5 Sexual Misconduct and 5.3.1 Alcohol.

13. Additionally, said notification advised Ross that a hearing on his Appeal to the Sexual Misconduct Board (SMB) was scheduled for March 30, 2016, and at said hearing he would serve as the complainant on behalf of Ball State University.

14. At the SMB hearing, Title IX investigators Lauren Berger and Tiffany Peters confirmed their lack of training indicating that the only training they had in investigating sexual misconduct cases were contained in the Code of Student Rights and Responsibilities Policy Manual, which contains nothing regarding interviewing techniques, proper questioning of the witness and the like.

15. Furthermore, at the SMB Hearing, Director, Michael Gillilan stated that he was there to advocate for the Defendant *and* for Jane Doe (in a dual role capacity).

16. Immediately thereafter, the SMB upheld the sanctions and findings of Michael Gillilan, prompting Ross to file an appeal pursuant to Defendant's Policies and Procedures.

17. Ross's appeal stated specifically (salacious and identifying information regarding Jane Doe redacted/omitted) :

**Dear Appellate Officer:**

**Pursuant to Mr. Gillilan's (Director) letter dated March 31, 2016, referencing the Sexual Misconduct and Harassment Policy (appeals section) and the Code of Student Rights and Responsibilities (Code), section 6.5.7, please let this serve as my (Mr. Ross) formal appeal.  To that end, please note the following:**

**First and foremost, it should be highlighted that the process in this matter was manifestly unjust to Mr. Ross, as he was not provided equal protection.  That issue may or may not fall into Ball State's definition of "substantial procedural error", which is unknown as it is not clearly defined nor has it been clearly explained, but it needs to be raised.**

**Two female investigators took a statement from a male accused of sexual misconduct.  For decades, female accusers have complained that they had to make statements in front of male investigators and it greatly intimidated them to the point they would not openly discuss their conduct or the conduct of the accused.  Corrections were made, and the result was that when same sex investigators took statements, the declarants were much more free to explain the specifics of the situation in the necessary graphic detail and justice was served.  The exact same holds true in this case.  There was no reason a male investigator could not take the statements of Mr. Ross.  The Director and his investigators act shocked that the female complainant talked more openly to female investigators than did the male respondent.  To ask an 18 year old young man to make graphic sexual statements to two female investigators is manifestly unjust.  Then to**

add insult to injury, at the SMB hearing, one of the investigators, supported by the Director, had the audacity to indicate that part of the reason they believed the complainant was that she talked more openly and in much more detail. Of course she did. And a review of the investigators comments and questions to the complainant and the respondent clearly show a bias in favor of the female complainant. She was allowed to continually make substantive changes to her story without follow up from the investigators (i.e. forgetting an event of alleged forceful sexual contact in her first interview, then subsequently remembering the event in detail without any challenge or follow-up questions from the female investigators). Mr. Ross would encourage the Appellate Officer to read the questions and answers, including the fact that he was not permitted to review the complainant's February 19 and February 29 statements until March 25, as the pattern of unequal questioning is blatant.

Additionally, the powers of the Director, and how he employed them in this case, although not knowing if they fall into the appealable provisions, should be pointed out as being manifestly unjust and do not provide equal protection. The Director appointed the female investigators to the matter despite knowing it was of a sexual nature, reviewed and oversaw their investigation, did not request follow up of significant issues (i.e. obtaining the deleted text messages or demanding more detailed explanation of the events from the roommate, whom he would later rely on as being vital to his determination, and the like). But his unjust behavior did not stop at permitting the unfair and biased investigation. He made negative comments, in person and in his initial January 14 Notice of Charge letter to Mr. Ross about him not giving an earlier statement, despite the fact that he knew he (Mr. Ross) was exercising his right to not self-incriminate as this matter was initially referred by the police to the Director's office; he has failed to establish standard protocol for investigation of sexual misconduct charges, instead letting the under trained investigators conduct investigations according to the Ball State Policies and Procedures, (as testified to at the SMB hearing by the investigator): chose the members of the SMB, coordinated calendars for the hearing and set a date and time before he ever notified Mr. Ross of the change in charges and sanctions; he failed and/or refused to provide the SMB hearing board a copy of the March 24, 2016 Notice of Charge letter; failed/refused to advise the SMB of the change of notice of charges (removing the alcohol charge) and sanction prior to the hearing; acted as an advocate for the complainant at the hearing, in addition to acting on behalf of Ball State (thereby giving an unequal value to the complainants version of events), and on and on. In this matter, the Director chose the investigators, trained the investigators, made the recommendation of punishment, chose the SMB and set the date and time before Mr. Ross was even aware of the changed charges and sanctions, discussed the matter with the SMB, then imposed the final sanction after the SMB he chose agreed with him on his recommended sanction. It will be informative and instructive to know the percentage of times, this and other, the SMB's have agreed with the Director's recommendations, and the actual interaction between the members and the Director. But, since Ball State will not provide such information or permit Mr. Ross to make such inquiry under this procedure, despite his future being in jeopardy, that discussion will take place in another venue on another day.

Simply put, the procedures and policy involved in conducting this investigation have been manifestly unjust to Mr. Ross, and he has been denied equal protection under, inter alia, Title IX as a result of those deficient and unjust policies, procedures and practices.

*1. A substantial procedural error that unreasonably impaired the student or the hearing body:*

*A. The March 24, 2016 Notice of Charge letter from the Director to Mr. Ross was a violation of Ball State Policies and Procedures and created a substantial procedural error that unreasonably impaired Mr. Ross' ability to properly and adequately investigate and defend the charges and the SMB's right to review all documents to render an appropriate recommendation..*

*Attached is a copy of Mr. Gillilan's March 24, 2016 letter to Mr. Ross. The letter is not titled, however, since the contents of the letter make it a NOTICE OF CHARGE letter, its contents and disclosure are covered in the Sexual Misconduct and Harassment Policy, specifically:*

**University Adjudication Procedures**

Where there is a preliminary determination that a policy violation occurred, adjudication will be governed by the Ball State *Code of Student Rights and Responsibilities* and as modified below. Following the preliminary determination, the Director of Student Rights and Community Standards or his <mark>designee</mark> (Director) will prepare a notice of charge regarding the applicable sections of this policy. The notice will include a recommended sanction and/or remedy. This notice will be sent to the complainant and respondent within three (3) business days of receipt of the final investigative report.

The Director will request separate meetings with the parties to review the notice of charge and subsequent procedures including options for the respondent to (a) accept responsibility for the charged violation and seek an informal resolution or (b) contest the charged violation and request a hearing.

1.  As specified elsewhere, both the complainant and the respondent may be accompanied at this meeting by an advisor of their choice;

2.  Prior to the meeting, both the complainant and respondent have an equal right to review the final report and any other information that will be used at the meeting in a timely manner prior to the meeting;

3.  If the respondent accepts responsibility in writing and seeks an informal resolution, the Director may impose sanctions up to and including suspension but not expulsion from the university;

4.  If the respondent requests a hearing, the Director will convene the Sexual Misconduct Board to conduct a hearing and determine if a violation has occurred. The determination in the hearing will be made using a preponderance of evidence standard.

*Initially, it appears from the final Investigative report that it was completed on or around the beginning of March 2016. This can be readily deduced from the fact that the last witness statement (from the complainant) was provided on or about February 29, 2016 and no other notes or investigative material follows. Also, there is no indication that the last statements were provided to the respondent, which they were not, so it is reasonable to presume that the final investigation report was completed shortly after the last statement, much in the same manner as the initial Final Report. Thereafter, pursuant to the provisions set forth above notice had to be sent to the complainant and respondent within three (3) business days of receipt of the final investigative report.)...it was not, which is a clear and substantial violation of Ball State Policies and Procedures.*

*One final note on the final investigative report. As previously set forth, the Director never set forth a date certain that said report was completed. This action is curious given the mandatory time deadlines. By not dating the report in any manner whatsoever, the Director, or the investigators, inappropriately put himself/herself in a position to indiscriminately set the deadlines to fit their specific needs, vs. the complainant and respondent's rights. In this case, it can clearly be shown how the Director used that to his advantage. When he sent the March 24, 2016 letter, he had already chosen the SMB, coordinated their calendars with his and the investigators, and set the date and time of the SMB hearing. Those steps could not and should not have been taken until after the Notice of Charge letter was sent, three (3) days had elapsed and the subsequent meeting wherein the respondent affirmatively requests the SMB hearing had transpired. That did not occur, and the Director's actions impaired Mr. Ross' rights.*

*In addition to the untimeliness of the March 24, 2016 Notice of Charge letter, it failed to set forth the sanctions as mandated (The notice WILL include a recommended sanction and/or remedy). Another direct and clear violation of Ball State's Policies and Procedures that impaired Mr. Ross' rights.*

*Also, with regard to the March 24 Notice of Charge letter, it was not provided to the Sexual Misconduct Board (SMB) prior to or at the hearing. In fact, the SMB was going under the clear impression that they were proceeding under the January 14, 2016 Notice of Charge letter, an issue that will be discussed later herein, which they were not. There is no evidence that they were ever even provided a copy of the March 24, 2016 letter. It would be impossible for the SMB to determine if the Notice of Charge letter was proper in both form and substance if they were denied the opportunity to review said letter. And, if it was provided after the hearing, the parties (complainant and respondent) would not have an opportunity to address the deficiencies in the Notice of Charge. Clearly, the egregious act of omitting the actual Notice of Charge letter from the final report provided to the SMB is a substantial violation of Policy and Procedure.*

*Regarding the charges omitted from the March 24, 2016 letter, the Director may argue that the charges were set forth in a prior Notice of Charge letter (January 14, 2016). However, that argument is disingenuous since the January letter was for two alleged violations instead of the one charge in the March 24 letter. The change in violations charged should be accompanied by a lesser sanction. But it is impossible to tell because the Director failed/refused to set forth the sanction in the March 24, 2016 Notice of Charge letter. Thereafter, when he was pressed about the issue in an email, a copy of which is attached, the day before the SMB hearing, he indicated that the sanction was the same as in January, which is "on its face" inaccurate per previous discussion. Furthermore, if that email is considered part of the Notice of Charge letter, he should have moved the SMB hearing to a date three (3) days from that date to properly comply with the policies and procedures. The Director's rush to have the hearing on the hearing date he had previously coordinated caused damage to Ball State's reputation for failing/refusing to follow proper procedure, and violated Mr. Ross' basic due process and procedure rights and impeded the SMB in deciding on all of the facts and issues.*

*B. The failure/refusal of the Director and/or investigators to properly permit Mr. Ross the opportunity to review the February 19 and February 29 statements of the complainant prior to the final investigative report was a violation of Ball State Policies and Procedures and created a substantial procedural error that unreasonably impaired Mr. Ross' ability to properly and adequately investigate and defend the charges.*

*Ball State sets forth mandates in Review of Investigative Reports, specifically:*

**Review of Investigation Report**

**At the conclusion of the investigation, the investigator will prepare a written report that summarizes the information gathered and synthesizes the areas of agreement and disagreement between the parties and any supporting information or accounts. In preparing the report, the investigator will review all facts gathered to determine whether the information is relevant and material to the determination of responsibility given the nature of the allegation. In general, the investigator may redact information that is irrelevant, more prejudicial than informative, or immaterial. The investigator may also redact statements of personal opinion, rather than direct observations or reasonable inferences from the facts, and statements as to general reputation for any character trait, including honesty.**

**Before the report is finalized, the complainant and respondent will be given the opportunity to review their own statement and, as permitted by FERPA, a summary of other information collected during the investigation, including the statements of the other party and any witnesses.**

A complainant and respondent may submit any additional comment or evidence to the investigator within three (3) business days of the opportunity to review the relevant portions of the report.

Upon receipt of any additional information by the complainant or respondent, or after the three (3) day comment period has lapsed without comment, the investigator will finalize the report and submit it to the Director of Student Rights and Community Standards.

*Mr. Ross was never given the opportunity to review the February 19 or February 29 statements made to the investigators by the complainant. In fact, the first opportunity he had to review said statements at all was when he received notice in the March 24, 2016 Notice of Charge letter (which, again, was not even provided to the SMB for review prior to or at the hearing) that he could review the undated final investigative report. It is impossible for the Director to make an equal protection argument on Ball State's behalf when the investigators gave the complainant an opportunity to make statements that were left unchallenged or explained, and provided them to the SMB to review prior to the hearing without giving Mr. Ross the mandatory opportunity to respond. It is logical to presume that as the SMB knew he had an opportunity to review her statements and respond, under the Policies and Procedures, since he failed to do so he must have no response. Furthermore, since he did not get the opportunity to review said statements from the complainant, it made it impossible for him to adequately investigate her motives and the like, prior to the hearing. Clearly the actions of the Director and his investigators were in violation of Ball State Policies and Procedures and created a substantial procedural error that unreasonably impaired Mr. Ross' ability to adequately and timely respond.*

*C. The Director misstated the standard for consent at the SMB hearing and created a substantial procedural error that unreasonably impaired Mr. Ross' ability.*

*In his March 31, 2016 letter, the Director specifically stated "the complainant's actions/behavior as described by the respondent did not constitute non-verbal consent". From the statement, it appears that the Director does not possess an adequate grasp of Ball State Policy and Procedures regarding non-consent.*

*The sections relating to consensual/non-consensual behavior are as follows:*

**Non-consensual Sexual Intercourse**

Non-consensual sexual intercourse is having or attempting to have sexual intercourse with another individual by force or threat of force, without effective consent, or where that individual is incapacitated. Sexual intercourse includes vaginal or anal penetration, however slight, with a body part (e.g., penis, tongue, finger, hand) or object, or oral penetration involving mouth-to-genital contact.

**Non-consensual Sexual Contact**

Non-consensual sexual contact is having sexual contact with another individual, by force or threat of force, without effective consent, or where that individual is incapacitated. Sexual contact includes any intentional touching of the intimate parts of another, causing another person to touch one's own intimate parts, or disrobing or exposure of another without permission. Intimate parts may include the breasts, genitals, buttocks, groin, mouth, or any other part of the body that is touched in a sexual manner.

**Understanding Consent**

Consent is a knowing, voluntary, and clear mutual agreement to engage in sexual activity. Consent is effective when it is informed, freely and actively given, and communicated by clearly and mutually understandable words or actions to participate in each form of sexual activity. This includes the following concepts:

1. Consent cannot be given by someone who is incapacitated. Engaging in sexual activity with someone who one knows to be, or reasonably should know to be, incapacitated is a violation of this policy. [Incapacitation is defined below.] Where alcohol or other drugs are involved, incapacitation is assessed with respect as to how the alcohol or other drugs consumed affects a person's ability to understand fully the "who, what, when, where, why, and/or how" of his/her sexual interaction with someone else. An individual accused of sexual harassment or misconduct is not excused if he or she was intoxicated and, therefore, did not realize the incapacity of the other person.

2. Indiana law provides that a minor (meaning a person under the age of 16 years) cannot consent to sexual activity. This means that sexual contact by an adult with a person younger than 16 years old is a crime, as well as violation of this policy, even if the minor wanted to engage in the act.

3. Consent cannot be inferred from silence, passivity, or lack of active resistance.

*First and foremost, it should be noted that there is no evidence or allegation of any sort of capacity concern for the complainant. By all accounts, the complainant was not intoxicated on the night in question, and had complete control of all of her faculties. Furthermore, she had control in that it was in her room, with her roommate in attendance and at no time was she made to stay either in the room or in the bed. Furthermore, at no time did Mr. Ross refuse to leave the room or the bed.*

*Regarding the statements made by Mr. Ross regarding consent, referred to without specificity by the Director, Mr. Ross specifically stated the following:*

# *REDACTED*

*In reviewing those actual statements and comparing them to the Ball State Policy, it is clear that, according solely to the respondent as the Director indicated in his March 31, 2016 letter, there was effective consent consistent with the Ball State Policy. To mandate that a verbal element must always be attached to consensual actions misstates the defined policy and violates Mr. Ross' procedural rights in a substantial way. Furthermore, to leave a definition such as the Director's to stand unfettered would lead to confusion when other Ball State students are faced with the same or similar circumstances. The Policy clearly states that actions can indicate effective consent, and the Director and the complainant were wrong to assert otherwise.*

*2. An unduly harsh sanction against the accused student.*

*This is a he said/she said case, as acknowledged by the Director at the SMB hearing. Clearly, this is not a case that would ever merit criminal prosecution, as it has already been reported to the police and they refused to press any charges. And, as previously discussed, there were many violations of Ball State Policy and Procedure that hindered and deprived Mr. Ross of his substantive due process rights. Simply put, an inadequate investigation, failing to verify and substantiate facts and evidence, failure to follow-up on leads, failure to properly train investigators, failure to follow proper Policy and Procedure, giving greater deference to the complainant (not allowing Mr. Ross to review her final two statements immediately after the investigation was complete and provide a response and investigate) for all intents and purposes, derails a kids college dreams. If Ball State University is truly desirous of helping kids, then why would they impose a two year suspension from Ball State, which essentially is a suspension from all universities? Mr. Ross has complied with all requests since the inception of this matter in November 2015 and should be helped where warranted and not cast adrift by a University.*

*Finally, as it relates to the Director's agreement to let Mr. Ross complete the semester, which is fair and just, it is unfair that he must move out the dorm he has been in during the entire pendency of this matter.  There is zero indication that during the entire process, since November of last year, that Mr. Ross has violated any mandates of the Director or his office.  He has stayed away from the complainant, as requested and required, including all times on and off campus. If the Director felt as though the University was safe with Mr. Ross attending class, which is the correct decision, then there is no reason to believe the University would not be just as safe if he is permitted to maintain his status on campus until completion of his courses.  To uproot him from his dorm at this time (the end of the semester and during finals), without justification, is simply unfair and unreasonable.*

**Thank you for your anticipated thorough review of this matter.**

18. On April 25, 2016, Ross was notified by Alan Hargrave that his appeal of the disciplinary decision of Michael Gillilan and/or the Sexual Misconduct Board was denied, thereby exhausting Defendant's State Administrative Remedies and formally imposed final sanctions/punishment on Ross.

19. A non-exhaustive list of the claims against Defendant for the aforementioned conduct was set forth in Ross's First Notice of Tort Claim (dated September 19, 2016), which stated:

**The misconduct on the part of some or all of the person(s) this Notice is hereby provided to, includes, but is not limited to, all issues raised during the course of the investigation, hearing and appeal, failure to conduct a thorough and impartial Investigation, gender bias against Claimant, failure to compel critical witnesses to testify at the disciplinary hearing, failing to provide Claimant with a viable opportunity to cross examine the witnesses against him, failure to provide Claimant an opportunity to meaningfully defend himself, failure to properly and thoroughly comply with Ball State University's Policies and Procedures, misrepresentations by Mr. Gillilan involving whether University Police had or would be notified,  misrepresentations by Mr. Gillilan regarding Ball State's Policies and Procedures,  Mr. Gillilan indicating he was acting on behalf of Jane Doe in the disciplinary hearings, while simultaneously overseeing the investigation and imposing the sanctions/punishment against Claimant, failure to abide by the requisite preponderance of the evidence standard, breach of contract, negligent hiring and retention, negligence, intentional and negligent infliction of emotional distress, the sanction/punishment was unwarranted and disproportionate in light of the circumstances, Violation of Title IX of the**

**Education Amendments of 1972,  Violation of Covenant of Good Faith and Fair Dealings, promissory estoppel, and/or Violation of Due Process Rights under 42 U.S.C. Section 1983.  Claimant will seek redress for each of the foregoing in Federal Court, which may include injunctive and declaratory relief, and will file for all claims not mandatory under the Tort Claims Notice Act prior to the mandatory waiting period set forth in said statute and hereinafter.**

20. On May 6, 2016 Ross filed a two count Complaint with Defendant against Jane Doe. The first count was a Sexual Misconduct Complaint, and the second count was a Complaint for Lying and Withholding Information.

21. In said Complaint, Ross specifically noted:

*I should first point out that I did not file this complaint until now for the reason that, out of respect and fundamental fairness for the process of Jane Doe's complaint (which was filed first).  I wanted the case she filed to be completed in the process.  It was my personal feeling that had I filed my complaint during the process of the investigations of Jane', the labeling and procedure of handling the cases contemporaneously would have greatly confused an already compromised system. Since that case, at least regarding Ball State's Policies and Procedures, is now complete (Appeal completed), I hope my grievance could be fairly heard and fully investigated on its own merits, with each party being clearly defined as complainant and respondent.*

22. Thereafter, an untimely, gender biased, incomplete, and unprofessional quasi-investigation with a predetermined outcome was conducted by Ball State employees/representatives, who had clear conflicts of interest and resulted in the expected outcome set forth below.

23. Then a decision was made by Michael Gillilan to not pursue either of Ross's Complaints against Jane Doe stating: "I (Mr. Gillilan) have completed my review…I (Mr. Gillilan) have determined that there is insufficient information…", causing Ross to Appeal said decision to Katie Slabaugh, Associate Dean of Students/Title IX Coordinator.

24. The Appeal to Ms. Slabaugh specifically stated (again, salacious and identifying material regarding the identity of Jane Doe has been redacted):

11

Ms. Slabaugh,

I am filing an appeal on both counts of my Complaint against (Jane Doe). I am addressing the appeal for both Counts in one letter because Mr. Gillilan inappropriately provided his decisions in one letter despite these complaints being filed separately.

Initially, it was a shock to see that Mr. Gillilan had made the determination not to pursue either of these matters ("I (Mr. Gillilan) have completed my review…I (Mr. Gillilan) have determined that there is insufficient information…" emphasis added). Despite Ball State University's Code of Student Rights and Responsibilities (2016-2017) being replete with language that each student will be treated fairly, equally, impartially and justly, and that no conflict of interest, real or perceived, will be permitted, the actual decision maker and advocate for Jane Doe in the companion charges she filed, Mr. Gillilan, is the exact same decision maker in this case.   This egregious and outrageous factor will be discussed in more detail later, however, at the outset it creates an unmistakable stench of bias against Ross and the entire process.  Furthermore, in addition to Mr. Gillilan's obvious and overt bias and conflict of interest is similar bias and conflict of interest of Mr. Jeff Shoup, who served as the Title IX investigator in this case for the sexual misconduct charge.

In the companion case filed by (Jane Doe) and adjudicated by Mr. Gillilan, Mr. Alan Hargrave served as the appellate review person on behalf of the complainant (Doe).  In that role, as you are well aware, he was tasked with review of all of the facts and circumstances of the case.  In fact, his responsibility included reviewing every fact, argument, statement and recommendation then analyzing each of them.  Ultimately, after his review, he upheld Mr. Gillilan's imposed punishment/sanction against Ross, and the factual basis for said punishment. Mr. Hargrave is Mr. Shoup's direct supervisor. This is especially dispositive due to the fact that Mr. Gillilan's August 11, 2016 letter clearly indicates that Mr. Shoup reviewed the entire file before making his recommendation not to pursue this matter further. There can be little doubt that when Mr. Shoup conducted his investigation and made his recommendation he was clearly aware that his immediate supervisor had already determined that (Jane Doe) was more credible.  Real or perceived, there is no doubt that that conflict of interest casts a shadow of doubt on any of the investigation and recommendation given by Mr. Shoup. A fact that is not addressed anywhere.

Regarding the specific recommendations of Mr. Gillilan, in addition to the above, his conduct and actions show his bias and conflict of interest, which severely prejudice Ross from receiving any fairness in this process.

When reviewing Mr. Gillilan's August 11, 2016 letter, his potential bias and conflict of interest underpinnings become blatantly clear.  The language in Ross's complaint on inappropriate sexual conduct by (Jane Doe) makes it clear that this matter was pursued under very specific provisions of Ball State University's Code of Student Rights and Responsibilities (2016-2017), specifically:

**Non-consensual Sexual Contact**

Non-consensual sexual contact is having sexual contact with another individual without effective consent. See discussion of consent in a following section. Sexual contact includes any intentional touching of the intimate parts of another, causing another person to touch one's own intimate parts, or disrobing or exposure of another without permission. Intimate parts may include the breasts, genitals, buttocks, groin, mouth, or any other part of the body that is touched in a sexual manner.

**Understanding Consent**

Consent is a knowing, voluntary, and clear mutual agreement to engage in sexual activity. Consent is effective when it is informed, freely and actively given, and communicated by clearly and mutually understandable words or actions to participate in each form of sexual activity. This includes the following concepts:

1. Consent cannot be given by someone who is incapacitated. Engaging in sexual activity with someone who one knows to be, or reasonably should know to be, incapacitated is a violation of this policy. [Incapacitation is defined below.] Where alcohol or other drugs are involved, incapacitation is assessed with respect as to how the alcohol or other drugs consumed affects a person's ability to understand fully the "who, what, when, where, why, and/or how" of his/her sexual interaction with someone else. An individual accused of sexual harassment or misconduct is not excused if he or she was intoxicated and, therefore, did not realize the incapacity of the  other person.

**Incapacitation**

Incapacitation is a state where someone cannot make informed, rational judgments and cannot consent to sexual activity. States of incapacitation can be temporary or permanent and     include, but are not limited to unconsciousness, sleep, mental disability, or any other state in which a person is unaware that sexual activity is occurring.

Where alcohol or other drugs are involved, incapacitation is defined with respect to how the alcohol or other drugs consumed affect a person's decision-making capacity, awareness of consequences, ability to make fully informed judgments, the capacity to appreciate the nature and quality of the act, or level of consciousness. In other words, a person may be considered unable to give effective

consent due to incapacitation if the person cannot appreciate or understand the "who, what, when, where, why, and/or how" of a sexual interaction.

Incapacitation is a state beyond "under the influence," drunkenness, or intoxication. The impact of alcohol and other drugs varies from person to person; however, warning signs that a person is approaching or has become incapacitated, may include slurred speech, vomiting, walking with   difficulty or with assistance, falling/stumbling, odor of alcohol, combativeness, or emotional volatility. Evaluating incapacitation also requires an assessment of whether a respondent       should have   been   aware   of   the   complainant's incapacitation based on objectively and reasonably apparent indications of impairment when viewed from the perspective of a sober, reasonable person in the respondent's position.

In determining whether consent has been given, the university will consider both (1) the extent to which a complainant affirmatively gives words or performs actions indicating a willingness to engage in sexual activity, and (2) whether the respondent was aware or reasonably should have known of the complainant's level of alcohol consumption and/or level of impairment. A respondent  is  not  excused from responsibility if he or she was intoxicated and, therefore, did not realize the incapacity of the other person.
An individual who engages in sexual activity with someone the individual knows or reasonably should know is incapable of making a rational, reasonable decision about whether to engage in sexual activity is in violation of this policy. (emphasis added).

When read together, as they are intended to be, it is clear that the intent, both stated and implied, of these provisions is that the person who is accused (Jane Doe herein) of the inappropriate sexual conduct is responsible to refrain from any such conduct when they know or reasonably should know the other person (Ross herein) is incapable of making rational, reasonable decisions about whether to engage in sexual activity.  In essence, what Ball State University is trying to do is protect an intoxicated person from themselves by placing a responsibility on the person who is aware they are intoxicated. This is a protective policy.  It takes into account that an intoxicated person may not totally appreciate what she/he is doing despite the fact he/she may possess some basic fundamental awareness.  Therefore, contrary to Mr. Gillilan's clearly biased attempt to put all of the focus and onus on how intoxicated Ross believes he was, the correct focus in this instance should be on Jane Doe and how intoxicated she knew or understood Ross to be.   Not surprisingly, that real, practical and protective definition was not even addressed or discussed by Mr. Gillilan at all, but will be now.

14

As documented, (Jane Doe) made the following statements:

"On Friday, September 18 (day that Jurassic World played in Prius), Jane Doe returned home from the movie and got a text from Ross asking if she wanted to go on a walk.  She agreed and when the met up, Jane Doe realized that he was very intoxicated"

"Ross indicated that he was pregaming for the movie and that he missed the movie so he just kept drinking"

By the time they reached David Letterman building (from walking from Lafollette), he was having a difficult time holding his water bottle."

"Ross indicated to Jane Doe that he hadn't eaten anything so she gave him a slim Jim.  At one point, Ross was leaning on Jane Doe trying to stay conscious and she told him that she thought he needed to sleep."

"Ross was staggering around and fell out of a chair and under Jane Doe's desk and the chair fell on top of him and Ross said, "just leave me here.""

"…Jane Doe's roommate looked over and asked "do you need help?" and Jane Doe replied "No, I'm fine believing that Ross was being "drunk and stupid".

"Jane Doe indicated that he was around a 15 (on a scale of 1-10) when they first met up, when they first got to the room and when she first laid down."

"At about 3 a.m.…she remembered his breath smelled like beer"

"During the middle of the night and when they had the initial conversation/argument (around 3:00 a.m.), Jane Doe indicated that he was about a 6-7".

"During this time he was walking (pacing) decently and only had a slight slur of his words.  She indicated "it wasn't like when I first met up with him".  "It was cohesive enough that he could put together a thought".  Additionally, he could register emotion and got angry during this time.  During the other time that she had seen Ross intoxicated at the beginning of the semester, he had been brutally honest and very giggly so his behavior was in contrast to when she first seen him intoxicated"

"Jane Doe couldn't really recall the context.  She believes it was when he first tried to kiss her and she said no but she can't remember.  She talked about it with her roommate and realized that she had also gotten some of the timeline wrong because she thought that they had attended an earlier movie"

These are actual stated facts made by (Jane Doe) during the prior investigation, since she refused to even provide a statement for this investigation, which were not discussed by Mr. Shoup or Mr. Gillilan.  It is unquestioned that (Jane Doe) knew Ross was highly intoxicated (staggering, falling down, passing out) when she took him back to her room, put him in her bed and got into bed with him.   Even a couple of hours later, when the sexual conduct continued, (Jane Doe) was still aware that Ross was intoxicated and persisted with her actions and refused to remove herself from the situation. This is exactly the type of behavior Ball State was seeking to protect its students from, and one has to seriously question if the genders had been reversed, if this matter would have been investigated and prosecuted much more vigorously.

Based on the apparent "tunnel" theory proffered by Mr. Shoup and Mr. Gillilan, if a person has any memory of the who, what, when, where, why and/or how they can't be incapacitated, it makes no difference that they may not be accurate about any of those items, just that they have some recollection.  In essence, unless they are blacked-out drunk, they are not incapacitated.  That is inapposite to the entire language of the policy, and thankfully for the remainder of Ball State Students, that is neither the real or expected standard.  Furthermore, he failed and/or refused to even attempt to evaluate his standard in an unbiased manner, a simple example of this was in a statement made by Mr. Gillilan in his August 11, 2016 letter, wherein he stated:

"During his interview several months later, AR was able to draw a detailed diagram of Jane Doe's room as it was arranged the night of September 19, 2015. The diagram included the location of beds, window, desks, chest of drawers and notes as which bed was lofted and which was not"

If Mr. Gillilan would have attempted to be unbiased, his notes from the previous investigation, which he indicates both he and Mr. Shoup utilized, clearly indicates that Ross, in response to the question "So how many times did you hang out, not counting class, before September 19?   And where would you hang out?  Your room?  Her Room?  Somewhere else? stated:

"I think 3 or 4 times in her room…"

Of course he knew the detailed layout of the room, because in the approximately one month he had been at school he had been in the room many times.  Clearly, Mr. Gillilan is still advocating for (Jane Doe) during the investigation of Ross's complaint.

Another example that Mr. Gillilan is still advocating for (Jane Doe) is in the following paragraph of his August 11, 2016 letter:

"3.  …he drank approximately five (5) shots of Bacardi rum in about two hours sometime before he initiated contact with Jane Doe at 1 a.m. by text and asked her

16

if she wanted to "hang""...At least two hours passed prior to the complained of sexual contact"

Based on this and the companion investigation, that statement is blatantly false. In those investigations, the statements of Jane Doe, whom Mr. Gillilan believes to be credible states:

 "At about 1:00 a.m., Jane Doe's roommate started getting ready for bed so Jane Doe also started getting ready for bed. Jane Doe's roommate asked Jane Doe if she wanted to sleep with her but Jane Doe said that she was fine so she decided to lay down on her bed facing away from Ross. REDACTED

"Eventually Ross dozed off back to sleep"

"At about 3:00 a.m., Jane Doe turned over in her sleep...Ross woke up and tried to kiss her..."

Clearly around 1:00 when Jane Doe went to bed, which was shortly after they arrived in the room, the sexual contact occurred. Although Ross and Jane Doe have, and most likely will, always dispute what occurred, it is undeniable that Mr. Gillilan again failed and/or refused to use all of the facts in an effort to protect Jane Doe's version of the events. Bias with an underpinning of conflict of interest.

When reading Mr. Gillilan's August 11 assessment of Ross's sexual misconduct complaint against Jane Doe, it is inescapable that he is advocating for Jane Doe. That makes sense because if he were to decide any matter whatsoever in favor of Ross, then his prior investigation and prosecution of Ross would be greatly undermined. This is precisely the reason that bias and conflict of interest are real issues, and that he should have never been involved in this complaint.

On final issue on the sexual misconduct investigation, despite many questions being unanswered by the roommate regarding the events of September 19, including text messages between Jane Doe and her roommate, which would greatly corroborate or contradict Jane Doe's statements, Mr. Shoup and Mr. Gillilan have refused to even request an interview on Ross' behalf or request the texts. Again, clear and unmistakable bias and conflict of interest as they are protecting either their own previous findings and investigation, or that of their superiors.

Accordingly, Mr. Gillilan's recommendation on the sexual misconduct count of the complaint should be reversed and the complaint should be referred to further adjudication, or, in the alternative, should have an investigation conduct by disinterested investigator(s) and review for recommendation by an unbiased person without a pervasive conflict of interest issue.

Regarding the count of the complaint concerning Jane Doe lying and withholding information from the prior investigations, again Mr. Gillilan's bias shines through.

Initially, Mr. Gillilan stated:

"2.  The underlying assertion that Jane Doe lied or and otherwise provided false information was considered and rejected by the Sexual Misconduct Board in the adjudication of Jane Doe's previous Complaint"

Unless Mr. Gillilan failed and/or refused to provide that information to Ross at the conclusion of the previous investigation, or during the course of the previous adjudication, it is a direct and knowing misrepresentation.   To Ross's knowledge and belief, the lying and withholding of evidence was never investigated or adjudicated until this proceeding.   Hence the current complaint.   If it was adjudicated without his knowledge or understanding it again appears as if Mr. Gillilan's bias has intervened in this case.

The entire point of this count of the complaint was that by Jane Doe's refusal to be forthright and provide investigators with the October 6, 2016 texts and discussions at the outset, instead of responding about them after they were discussed and produced by Ross, it created an implication that she was afraid of Ross and always wanted him out of the class.   In fact, the opposite is true.   The texts clearly show that Jane Doe was initially comfortable with Ross being in class and had no desire for him to change classes.   When that became an inconvenient truth for Jane Doe, and it made more sense for her to be afraid to have him in class, she changed her position and conveniently failed to disclose the facts or the text to the investigators. Jane Doe, through her manipulation of the process by failing to disclose, created a different narrative of the relationship between the parties, and Mr. Gillilan's August 11, 2016 assertions are an attempt to bolster her credibility on the issue. Again, the common theme of Mr. Gillilan's obvious bias and conflict of interest comes into play, for if Jane Doe is found not credible in any aspect of this complaint, it undermines his decision-making in the prior case.

Finally, whether Jane Doe's actions had an impact on the outcome of her complaint is not relevant to this complaint. The only thing that matters for my complaint is that she did lie and withhold information.   That point has been muddied by Mr. Gillilan's self-protection and continued unwavering support of Jane Doe.

Accordingly, Mr. Gillilan's recommendation on the lying and failing to disclose count of the complaint should be reversed and the complaint should be referred to further adjudication, or, in the alternative, should have an investigation conduct by disinterested investigator(s) and review for recommendation by an unbiased person without a pervasive conflict of interest issue.

25. On September 18, 2016, Ross was notified by Katie Slabaugh, Associate Dean of

Students/Title IX Coordinator, that Ross' allegations against Jane Doe concluding

that "I am in full agreement with the determination that there is insufficient information to warrant adjudication of your complaint of sexual misconduct…I do not support your request for further investigation steps to be taken regarding the complaint of providing false testimony".

26. A non-exhaustive list of the claims against Defendant for the aforementioned conduct was set forth in Ross's Second Notice of Tort Claim (dated September 23, 2016), which stated:

**The misconduct on the part of some or all of the person(s) this Notice is hereby provided to, includes, but is not limited to, all issues raised during the course of the investigation, hearing and appeal, failure to conduct a thorough and impartial Investigation, gender bias against Claimant, failure to compel critical witnesses to testify, failing to provide Claimant with a viable opportunity to cross examine the witnesses against him, failure to provide Claimant an opportunity to meaningfully defend himself, failure to properly and thoroughly comply with Ball State University's Policies and Procedures, misrepresentations by Ms. Slabaugh regarding who was responsible for and conducting said investigations, improper notification under the Cleary Act, misrepresentations by Mr. Shoup regarding Ball State's Policies and Procedures, failure to abide by the requisite preponderance of the evidence standard, breach of contract, negligent hiring and retention, negligence, intentional and negligent infliction of emotional distress, Violation of Title IX of the Education Amendments of 1972, Violation of Covenant of Good Faith and Fair Dealings, promissory estoppel, and/or Violation of Due Process Rights under 42 U.S.C. Section 1983.  Claimant will seek redress for each of the foregoing in Federal Court, which may include injunctive and declaratory relief, and will file for all claims not mandatory under the Tort Claims Notice Act prior to the mandatory waiting period set forth in said statute and hereinafter.**

27. When Defendant subjected Ross to disciplinary action, they did so in an arbitrary and capricious way, and in discrimination against him on the basis of his sex.  Defendant failed and/or refused to adhere to its own policies and procedures and the policies and procedures themselves are inherently discriminatory and insufficient to protect the rights of male students.  The decisions reached in each of the two separate proceedings were

discriminatory given the evidence (or lack thereof), a discriminatory bias against males and the underlying motive to protect Defendant's reputation and financial well-being for a conclusion of sexual misconduct to be reached.

28. Ross has been greatly damaged by the actions of Defendant, his education and career prospects compromised, significant monies spent on obtaining a college education at another no-State school and his college education at Ball State University squandered. Additionally, as a result of Defendant's actions and inactions, Ross has suffered physical, psychological, emotional and reputational damages, economic injuries/damages and loss of educational and career opportunities.

29. Ross therefore brings his action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972, breach of contract, negligence and other state law causes of action.

### A. PARTIES, JURISDICTION and VENUE

30.  At all times relevant to this Complaint, Ross was a natural person, citizen of the United States and resident of the State of Indiana.  During the events described herein, Ross was a student at Ball State University and resided on the University's campus in Muncie, Indiana.

31.  Defendant, Ball State University is an Indiana political subdivision and educational instrumentality of the State of Indiana, with its principal place of business located in Muncie, Indiana.

32.  Upon information and belief, Defendants are acting under regulations set forth in the Indiana Code, and policies, procedures and practices of Ball State University, and are responsible for administering and/or operating Defendant's policies.

33.  This actions arises under Title IX of the Educational Amendments of 1972, 20 U.S.C. Sec. 1681, *et. seq.,* and Indiana Common Law.

34.  This court has Jurisdiction over this action by virtue of federal question jurisdiction pursuant to 28 U.S.C. §1331.

35.  This court has personal jurisdiction over Defendant because Defendant resides in Indiana and/or conducts business within the State of Indiana.

36.  Venue rests with this Court pursuant to 28 U.S.C. § 1391 and Southern District Civil Rule 82.1 because a substantial part of the events or omissions giving rise to the claims occurred in its judicial district.

**<u>COUNT I:</u>**

**<u>Violation of Title IX of the Education Amendments of 1972</u>**

Plaintiff adopts and incorporates by reference the allegations in paragraphs 1-36 and further alleges as follows:

37.  Pursuant to 20 U.S. Code § 1681, et. seq, Title IX is a federal statute designed to prevent, *inter alia,* sexual discrimination in educational institutions receiving federal funding.

38.  Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681-1688, applies to all public or private educational institutions that receive federal funds, including colleges and universities.  The statue prohibits discrimination based on sex in a school's "educational program or activity."  Title IX provides, in pertinent part "[n]o person in the United States shall, on the basis of sex, be excluded from participation in or be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §

21

1681(a).   The United States Supreme Court has held that Title IX authorizes private suits for damages in certain circumstances.

39.  Defendant receives Federal financial assistance and is thus subject to Title IX.

40.  Title IX includes an implied private right of action, without any requirement that administrative remedies, if any, be exhausted.  An aggrieved plaintiff may seek money damages and other relief.

41.   Both the Department of Education and Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complains alleging any action which would be prohibited by" Title IX or its regulations.   34 C.F.R § 106.8(b) (Department of Education); 28 C.F.R § 54.135(b) (Department of Justice).

42.   Title IX mandates Defendant afford equitable procedures and due process to Ross which includes, but is not limited to, (a) providing adequate, reliable and impartial investigation of complaints, including the opportunity to present witnesses and other evidence, and/or (b) that Defendant's employees involved in the conduct of the procedures have adequate training.

43.  Upon information and belief, in fact, specifically testified to at the SMB hearing by the investigators, Defendant knew, or in the exercise of due care should have known, employees did not have proper and/or adequate training regarding Title IX sexual misconduct claims, which caused them to violate Ross's Title IX rights.

44.  Defendant's policies and the implementation thereof fail to meet the standards required by Title IX regarding how institutions of higher learning conduct disciplinary proceedings.

45.  As detailed throughout this Complaint, Defendant created an environment in which male students accused of sexual misconduct, such as Ross, are fundamentally denied due process as

to be virtually assured of a finding of guilt.  Such a biased and one-sided process deprives male Ball State University students of educational opportunities based on their gender/sex.

46.  Defendant had actual or constructive knowledge that its investigation and/or discipline of Ross posed a persuasive and unreasonable risk of gender discrimination with regard to Ross.

47.  Defendant's actions and inactions detailed in this Complaint set in motion a series of events that Defendant knew, or reasonably should have known, would cause male Ball State University students, such as Ross, to suffer unlawful gender discrimination.

48.  Defendant's investigation and/or discipline of Ross is discriminatory and based upon and/or motivated by Ross's male gender.

49.   The male gender discrimination by Defendant against Ross, in addition to that previously set forth in this Complaint, includes, but is not limited to, preferential treatment given to Jane Doe in the method and manner witness statements were provided and the investigation is conducted, including the fact that Defendant failed and/or refused to provide Ross the same protection in his complaints against Jane Doe and those that were afforded to her.

50.  As set forth above, the outcome was predetermined and simply a motion into a biased, prejudicial and implicitly unfair process against Ross.

51.  Based upon the foregoing, Defendant imposed an unwarranted and excessive sanction on Ross as a result of an erroneous outcome reached by a flawed investigation.

52.  Based on the foregoing, Ross was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

53.  As a result of the foregoing, Ross is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses and costs.

WHEREFORE, Plaintiff, by Counsel, demands judgment against the Defendant in an amount to be determined at trial, for attorney's fees, prejudgment interest, for the costs of this action, and for all other relief the court deems just and proper in the premises.

## COUNT II

### Breach of Contract

Plaintiff adopts and incorporates by reference the allegations in paragraphs 1-53 and further alleges as follows:

54.   Ross applied to and enrolled at Ball State University and, with the assistance of his parents, paid tuition and other fees and expenses.  Ross did so in reliance on the understanding, and with the reasonable expectations, *inter alia*, that Defendant would implement and enforce its policies and Defendant would comply with the requirements of applicable law.

55.   Defendant's policies create an express contract or, alternatively, a contract implied in law or in fact, between Defendant and Ross.  Defendant violated these contracts by engaging in the conduct detailed in this Complaint.

56.  Defendant improperly and unlawfully applied its policies in part by not affording Ross rights to which he is entitled.

57.  Defendant also violated its policies in part by applying an incorrect definition of consent.

58.   Defendant's unlawful conduct, detailed in this Complaint, evidences its repeated and material breaches of its policies as well as a breach of implied covenant of good faith and fair dealing inherent to Defendant's policies.

59.   During all times relevant to this complaint, Ross did all, or substantially all of the significant things that Defendant's policies required him to do.

60.   Defendant's aforementioned breaches of its policies were wrongful and without lawful justification or excuse.

61.   As a direct and foreseeable result of these breaches of contract, Ross has sustained, and will continue to sustain, injury damage and loss, including, but not limited to: mental anguish, emotional distress, loss of educational opportunities and loss of career prospects.

WHEREFORE, Plaintiff, by Counsel, demand judgment against the Defendant in an amount to be determined by trial, an Order requiring Defendant to expunge Plaintiff's official and unofficial files of all information related to his interactions with Jane Doe, including but not limited to charges and sanctions served, and prohibiting Defendant from disclosing such information to any party, for the costs of this action, and for all other relief the court deems just and proper in the premises.

## COUNT III

## Negligence

Plaintiff adopts and incorporates by reference the allegations in paragraphs 1-61 and further alleges as follows:

62.   Defendant owed duties of care to Ross, arising from the obligations delineated in Defendant's Policies and Procedures, and directives issued by the U.S. Department of Education's Office of Civil Rights.  Such duties included, without limitation, a duty of reasonable care to allow Ross an equal opportunity to present information and witnesses in support of his defense, a duty of care to conduct an impartial and thorough investigation of the allegations of sexual misconduct against and for Ross, a duty to properly and adequately train its investigative staff, and a duty of care to utilize the preponderance of the evidence standard in reaching a determination.

63.  As set forth in this Complaint, Defendant breached their duties owed to Ross.

64.  As a direct and proximate result of the conduct set forth in this Complaint, Ross sustained damages, including, without limitations, emotional distress, economic injuries and other direct and consequential damages.

WHEREFORE, Plaintiff, by Counsel, demands jury trial and judgment against the Defendant in an amount to be determined by trial, for the costs of this action, and for all other relief the court deems just and proper in the premises.

Respectfully submitted,

HOCKER & ASSOCIATES, LLC

_/s/ Brett E. Osborne_____
Brett E. Osborne
Attorney No: 17492-45
6626 E. 75TH Street, Suite 410
Indianapolis, Indiana 46250
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of April 2018, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's ECF.  Parties access this filing through the Court's system.

__/s/ Brett E. Osborne__
Brett E. Osborne
#17492-45