IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ADAM ROSS,
                    Plaintiff,                                   CASE NO.  1:18-cv-01258-JRS-TAB
v.

BALL STATE UNIVERSITY,
                    Defendant.

## BRIEF IN SUPPORT OF DEFENDANT BALL STATE UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT

### I.    Introduction and Background

This is a lawsuit alleging a violation of Title IX of the Education Amendments of 1972, 20 U.S.C. Sec. 1681 et seq. Plaintiff alleges he was discriminated against because of his gender, male, in the course of Defendant Ball State University's ("Ball State" or "BSU") investigation of a sexual assault claim against him, and subsequent internal disciplinary proceedings. Plaintiff also alleges state law claims of breach of contract and negligence.

Plaintiff Adam Ross was enrolled as a freshman at Ball State in the fall of 2015.  After an incident that September with M.K., a female freshman student, Plaintiff was charged with violations of the Ball State University Code of Student Rights and Responsibilities, in particular the Sexual Misconduct Policy.  An investigation was undertaken and a hearing held by the University's Sexual Misconduct Board.  Plaintiff was found responsible for violating the school's policy and suspended from the University for two academic years.  This lawsuit against Ball State is predicated on the notion that the investigative and/or adjudicatory process discriminated against Plaintiff because he was a male.

## II.     Factual History

Adam Ross enrolled at Ball State as a freshman entering the University for the fall semester of

the 2016-1017 academic year.  During summer orientation he met M.K.[1], a freshman woman also

beginning school that semester.  They became casual friends but did not date.  (Def.'s S.J. Exhibit B,

Deposition of Plaintiff Adam Ross (hereafter "Ross"), pp. 12-13).  Plaintiff has a vague memory of

receiving instructions and information during orientation about the University's sexual misconduct

policies. (*Id*., pp. 15-16).  Among other things, he understood it was prohibited to force oneself

sexually upon another. (*Id*.)

During the evening hours of Friday, September 18, 2015, Plaintiff drank five shots of rum over

a two hour period. (*Id*., pp. 17-18; Def.'s S.J.Ex. A, Complaint, Para. 2).  Asked whether that much

alcohol in that amount of time made him intoxicated, Mr. Ross said no - that he would have had to have

have drank that volume in half the time, or one hour, to get intoxicated.  He testified he was not

intoxicated, and later told University investigators that he was a "3" on a scale of 10 - - a condition he

referred to as "under drunk." (Ross, pp. 21-23, 86-87).

A couple of hours after he finished drinking, he and M.K. texted and they agreed to go for a

walk on campus. (*Id*., pp. 19, 21).  After the walk, M.K. invited Mr. Ross up to her room because she

was concerned that it was obvious he had been drinking and that he could get in trouble out on

campus. (Def.'s S.J. Ex. "C," Declaration of Tiffany Peters, Ed.D., Para. 12, Ex. 1 thereto, Statement of

M.K., at p. 4).  Initially, M.K. and her roommate J.G. worked on computers for a while as Mr. Ross

slept.  The women turned in at 1:00 a.m., at which time Mr. Ross woke up and began to make

---

[1] Ball State submits Plaintiff's Complaint as S.J. Exhibit A.  In the Complaint, the female student M.K. is referred to as "Jane Doe."

advances toward M.K., such as trying to put his hands under her clothing.  She told him "no," and after saying that multiple times, he quit. (*Id.*)  J.G., her roommate, heard M.K. saying "no" and asked if she needed help, but M.K. said that Mr. Ross was just being drunk and stupid. (*Id.*).  He then went back to sleep.

Around 3:00 a.m., as they faced each other on the bed, Mr. Ross woke up and tried to kiss and began to inappropriately touch M.K.  Despite her persistently telling him "no," he continued the conduct.  At one point he got up, paced around, then sat back down on the bed and grabbed M.K. by the wrists and began kissing her again and pulled her pants down and digitally penetrated her. (*Id.*, pp. 4-5).  She began to shake and cry, and he stopped and tried to calm her down. (*Id.*, p. 5).  They went back to sleep, and two hours later M.K. was awakened by Mr. Ross lifting her leg and partially inserting his penis in her vagina.  M.K. was afraid to move or cry out.  Mr. Ross quit after a few minutes, got up and left. (*Id.*).

M.K. sat on her bed, calling for her roommate.  J.G. joined her on the bed and M.K. reported that Mr. Ross had raped her. (*Id.*).  Immediately the next day M.K. went and purchased a "Plan B" (morning after) contraceptive pill. (*Id.*).  Mr. Ross texted her, apologizing: "Hey, I'm so sorry about last night.  I feel incredible [sic] bad and I promise it will never happen again." (*Id.*, Ross Dep. Exhibit A, text messages).  M.K. responded: "Do you not realize the magnitude of what you did this morning?" (*Id.*).  When informed M.K. intended to buy the contraceptive, Mr. Ross responded: "I didn't think I put it in I swear."  M.K. replied: "Even though I told you no, I can't believe you actually fucking did that while I was sleeping." (*Id.*).

M.K. was conflicted over what to do.  She spoke to a counselor, but otherwise waited a few days, hoping Mr. Ross would apologize.  However, when she saw him next the impression he gave was

as if to pretend it did not happen. *(Id.*, p. 6).  M.K. told others and was urged to report the matter, but she didn't want Mr. Ross to get in trouble. (*Id.*)  M.K.'s brother ("T.K.") visited her, and she confided in him.  T.K. then questioned Mr. Ross, and the story the Plaintiff was telling changed; Mr. Ross was not accepting responsibility for his actions. (*Id.*)  M.K. discussed everything with her family over the next few weeks then concluded she needed to report it, and did so by telling her residential advisor. (*Id.*).  At that point the matter was referred to Ball State's Title IX compliance office.

The University has elaborate procedures for investigating and adjudicating matters of alleged sexual harassment and misconduct.  The "Code of Student Rights and Responsibilities APPENDIX K - Sexual Harassment and Misconduct Policy," is a thirty-two (32) page written guide to Ball State's procedures and is readily available online. (Ross, p. 37, Ross Dep. Ex. I).  Apart from defining its scope and identifying prohibited conduct, APPENDIX K devotes fourteen (14) pages to policies and procedures, beginning with the process of reporting misconduct through the conclusion of adjudicatory procedures, if applicable. (*Id.*)

Upon receipt of a complaint, APPENDIX K provides that the University's Title IX Coordinator (Katie Slabaugh) will conduct a review, determine if immediate measures are necessary for the well-being of the complainant, and also determine whether or not an investigation is warranted (*Id.*, pp. 21-23).  Ms. Slabaugh determined to commence an investigation, and assigned two Title IX investigators, Dr. Tiffany Peters and Ms. Lauren Berger, to conduct the investigation. (Peters, Para. 5).  She also referred the matter to Dr. Michael Gillilan, Ball State's Director of Student Rights and Community Standards, to issue a "no contact" order prohibiting Mr. Ross from having any contact with M.K. (Def.'s S.J. Ex. D, Deposition of Michael Gillilan (hereafter "Gillilan"), pp. 7-9; Ross. p. 28 and Ross Dep. Ex. B, No Contact Letter of November 16, 2015 from Gillilan to Ross).

4

Dr. Peters is Assistant Dean of Students at Ball State. At the time she and Ms. Berger were assigned the Ross case, Dr. Peters had completed more than sixty (60) hours of training regarding Title IX investigations and policy. Ms. Berger had five (5) hours of training. Both investigators participated in all phases of the investigation with Dr. Peters acting as supervisor of Ms. Berger. (Peters, Paras. 6-10).

Dr. Peters and Ms. Berger then interviewed M.K. on November 13, 2015 and again on November 23, 2015. Their report of those interviews was twelve (12) pages long, including copies of texts. (*Id.*, Para. 12 and pp. 3-15 of "Final Report," Ex. 2 to the Peters Declaration). In her statement, M.K. recounted facts already summarized previously. They next interviewed M.K.'s roommate, J.G., on November 19, 2015. J.G. reported hearing M.K. say "no, no, no" multiple times as she (J.G.) saw Mr. Ross trying to do things to her. When that stopped, they all fell asleep, but J.G. was awakened by hearing arguing and M.K. crying. When Mr. Ross left, M.K. reported to J.G. that "he raped me." (*Id.*, Final Report, pp. 19-21).

The investigators then interviewed Mr. Ross on November 20, 2015 in the presence of his attorney and parents. Although he provided details of how he met and knew M.K., he declined to talk about the evening in question, asserting his Fifth Amendment right against self-incrimination.[2] The investigators' summary of their interview of Mr. Ross was detailed in a three (3) page document. (*Id.*, Final Report, pp. 16-18). They also interviewed his mother about conversations she had with Mr. Ross and M.K. That interview was summarized in a two (2) page memo. (*Id.*, Final Report, pp. 39-40).

On November 23, 2015 the investigators conducted an interview of M.K.'s brother, T.K., who had interaction with Mr. Ross after the evening of the assault. They summarized this in a four (4) page

---

[2] Ball State's APPENDIX K provides that upon receipt of complaints, they are referred to law enforcement among other things. Mr. Ross later explained in his deposition that this was his concern (Ross, p. 31).

memo. (*Id.*, Final Report, pp. 23-26).  Finally, they interviewed Jenna Clemens, a counselor to whom M.K. had first confided on September 20 about the sexual assault the day before, and who followed her condition in the days afterward.  They summarized that interview in a twelve (12) page memo, much of which included texts between M.K. and Ms. Clemens in the days after the assault discussing her anxieties about possible pregnancy, testing for sexually transmitted diseases, whether to share events with her parents, and related matters.  This was included in their report. (*Id.*, Final Report, pp. 27-38).

At this point, Dr. Peters and Ms. Berger believed they had concluded their investigation and prepared a draft "Final Report."  The University's procedures provide that such a draft, including all the previously described interview reports and documentary evidence, such as text messages, is shared with both the complainant and respondent, as it was here (Ross, p. 30; Gillilan, p. 14; Peters, Para. 10).  The Report then went to Dr. Gillilan, whose duties include reviewing such reports and determining if they merit further action, including whether to charge the respondent with violations of the Code, propose sanctions, and provide information about the availability of an adjudicatory hearing process before the University's Sexual Misconduct Board. (Gillilan, p. 10).  Hearings are conducted by a three (3) member Board consisting of faculty and staff who have received training in adjudicating matters alleging sexual misconduct. (*Id.*, pp. 22-23).

Dr. Gillilan elected to charge Mr. Ross with violations of the Sexual Misconduct Policy and alcohol prohibitions, and so advised him by letter of January 14, 2016. (*Id.*, p. 60; Ross. p 32, Ross Dep. Ex. "D").  The letter advised Mr. Ross that he was being charged with violating Section 5.1.5 of the Code, which prohibits Sexual Misconduct.  It summarized the points in the evidence gathered by the investigators that caused Dr. Gillilan to conclude that there was probable cause that the events

complained about had happened and that they were non-consensual.  The letter recommended a two year suspension and requested a prompt meeting to discuss the matter, and his options, with Mr. Ross. It advised him of his right to a hearing, or the option to accept responsibility (*Id.*, Ross Dep. Ex. "D").

Mr. Ross then requested an opportunity to speak to the investigators again and provide his version of events.  Even though the investigation was technically closed and in the hands of Dr. Gillilan, the University reopened it to allow Mr. Ross to provide his statement.  He was interviewed by Dr. Peters and Ms. Berger on February 3, 2016 with Dr. Gillilan and Mr. Ross's attorney present. In the interview, Mr. Ross admitted to sexual contact with M.K. by digital penetration, but maintained the encounter was consensual.  He indicated he was not drunk, but rather only a "3" on a scale of 10. In his words, "a little buzzed but under drunk." (Peters Declaration Ex. 2, Final Report, p. 46).  The February 3 interview was summarized and a twenty-four (24) page addendum was prepared and added to the Final Report previously finished on December 3 (*Id.*, Final Report, pp. 45--68 and Peters, Para. 12, and Ex. 3 to Peters' Declaration).  Mr. Ross testified that it was an accurate summary of his statements. (Ross, p. 34).

After review of the additional evidence, Dr. Gillilan believed the facts had not materially changed and determined to proceed as he had outlined in his January 14, 2016 letter. He  wrote to Mr. Ross on February 25, 2016 to inform him of that fact, and he once again advised him of his right to a hearing or the option to accept responsibility. (Ross, p. 35 and Ross Dep. Ex. F; Gillilan, p. 64).  This was followed on March 24, 2016 with a formal notice of an evidentiary hearing and advisement of rights. (Ross, p. 35, and Ross Dep. Ex. G; Gillilan, p. 63).  The March 24 letter detailed the provisions of the Code Mr. Ross was alleged to have violated, advised him of the time and place of the hearing, and that the matter would be heard pursuant to the procedures in the Student Code, a link to which

was provided. It also summarized those procedures in a number of bullet points, including that Dr. Gillilan would present the University's case, that the complainant would be a witness, that the Procedures in the Code provided he could call his own witnesses and cross-examine adverse witnesses through questions submitted to the Board, that he may have an advisor present, but the advisor could not actively participate, that he would have the right to make a statement, and that the Final Report would be provided to the Board in advance. The letter identified the Board members selected to hear the matter. (*Id.*).

Mr. Ross testified that he reviewed the procedures for the hearing and understood his rights. His attorney was present. He also testified that he had no reason to believe that any member of the Board was biased against him or unqualified to serve. (Ross, pp. 37-39).

In evidentiary hearings such as the one involving Mr. Ross, the chair of the Board is provided with a script of the process to follow. A true and accurate copy of the generic script is attached as Def.'s S.J. Ex. G-1 and the script used for the Ross hearing at Def's S.J. Ex. G-2. Hearings are recorded and transcribed. A true and accurate copy of the transcript of Mr. Ross's hearing is attached as Def.'s S.J. Ex. G-3.

At the hearing, Mr. Ross chose not to call any witnesses in his defense (Ross, pp. 52-53). He testified that the hearing procedures in APPENDIX K were followed. (*Id.*, pp. 58-65). Dr. Gillilan also testified that he believed the procedures were followed. (Gillilan, p. 67)

After the hearing, the Board deliberated and concluded that Mr. Ross was responsible for a violation of the University's Sexual Misconduct policy and imposed a two year suspension. On March 31, 2016, Dr. Gillilan wrote a letter to Mr. Ross to inform him of the Board's findings, summarizing the evidence the Board found persuasive in eleven (11) detailed paragraphs. (Ross., p. 66, Ross Dep.

Ex. "J").  These included the fact that M.K. was telling Mr. Ross "no," at multiple times throughout the night, as corroborated by her roommate, and that both parties agreed there was never verbal consent.  The Board also found that the text messages corroborated M.K.'s statement about what happened.  Dr. Gillilan also modified the Board's two year suspension starting date to allow Mr. Ross to complete his spring semester at Ball State because by the time the proceedings were complete, the spring semester was almost over. (*Id.*)

Mr. Ross was advised of his right to appeal the decision to Dr. Alan Hargrave, Associate Dean of Students, and he did so.  He agreed he had the opportunity to make all the arguments he wanted on appeal. Dr Hargrave denied the appeal. (*Id.*, p. 66).

At the conclusion of all proceedings concerning M.K.'s complaint against him, Mr. Ross then filed his own complaint against her.  On May 6, 2016, he filed a charge of sexual misconduct against M.K., alleging that he had been incapacitated by alcohol intoxication during their encounter and was therefore incapable of giving consent. (Ross, pp. 67-69; 72-73; 86-87, Ross Dep. Exs. "K", "L").  He also alleged she had lied about text messaging during the prior investigation. (*Id.*).

Ball State's Title IX office assigned the investigation of Mr. Ross's charge of sexual misconduct to Jeff Shoup, a Title IX investigator and Assistant Director of Housing and Residence Life. (Def.'s S.J. Ex. "E", Dep. of Jeff Shoup (hereafter "Shoup"), pp. 6-7).  Mr. Shoup met with Mr. Ross and his mother on May 25, 2016 to interview him about the complaint.  This interview was summarized in seven (7) pages of Mr. Shoup's Final Report. (Ross. Dep. Ex. "M", Final Report, pp. 3-8).  About a month later, Mr. Ross was interviewed again in the presence of his mother and his attorney.  This was summarized in another seven (7) pages of Mr. Shoup's Final Report (*Id.*, Final Report, pp. 8-14). Mr. Shoup also reviewed Mr. Ross's earlier statements to Dr. Peters and Ms. Berger from the first

investigation and summarized those statements as well in his Final Report (*Id.*, Final Report, pp.

14-28).

Mr. Shoup decided whom to interview based upon Adam's complaint and statements.  He

attempted to interview M.K., but she declined and referred him to the interviews she had already

given.  Mr. Shoup documented his summary of those prior interviews in his Final Report (*Id.*, Final

Report, pp. 28-34).  He did not attempt to interview M.K.'s roommate as Adam did not report

contact with her. (Shoup, pp. 14-19). Mr. Shoup described his role as a fact-finder who gathered

information and forwarded it to Dr. Gillilan for a decision. (*Id.*, pp. 14, 21).  At the conclusion of his

Final Report, Mr. Shoup added sections identifying the sexual contact/consent policies at issue as well

as the definition of incapacitation found in APPENDIX K (*Id.*, pp. 35-37).  In pertinent part, this

definition stated:

> Where alcohol or other drugs are involved, incapacitation is defined
> with respect to how the alcohol or other drugs consumed affect a
> person's decision-making capacity, awareness of consequences, ability
> to make informed judgments, the capacity to appreciate the nature and
> quality of the act, or level of consciousness.  In other words, a person
> may be considered unable to give effective consent due to
> incapacitation if the person cannot appreciate the "who, what, when,
> where, why and/or how" of a sexual interaction.
>
> Incapacitation is a state beyond "under the influence."

(*Id.*, p. 35; Ex. "I" (APPENDIX K) p. 14).

At page 36 of his Final Report, Mr. Shoup devoted a few paragraphs to an analysis of the facts

from his investigation.  Citing Mr. Ross's own previous statements to Dr. Peters and Ms. Berger about

his level of sobriety, Mr. Shoup concluded that "[b]ased upon his own information, it does not appear

as though he was intoxicated at the time of the sexual contact that he believes was non-consensual."

(Final Report, Ross Dep. Ex. "M", at p. 36).

Adam had based his complaint on the fact that when M.K. first saw him that night, she reported he was very drunk ("15 on a scale of 10") and that therefore, based upon her report, he claimed he must have been too intoxicated to give effective consent. Mr. Shoup's analysis, however, pointed out that the sexual contact at issue happened hours later, in the middle of the night, at a time when M.K. described him as considerably more sober. (*Id*.).

Mr. Shoup completed his thirty-seven (37) page report on July 20, 2016 and first provided it to Mr. Ross to review. (Shoup, p. 28-29). Mr. Ross made corrections and additions. (*Id*.). At his deposition, Mr. Ross testified that he could not identify any policy that Ball State did not follow in the investigation. (Ross, pp. 71-73). He testified that he had no evidence that Mr. Shoup was biased against him, nor could he identify any other actions that Mr. Shoup should have done as the investigator. (*Id*., pp. 78-79).

The Final Report was sent to Dr. Gillilan, who wrote Mr. Ross on August 11, 2016 to inform him that there was insufficient information to proceed with the complaint of sexual misconduct against M.K. (Ross, p. 24, Ross Dep. Ex."O;" Gillilan, pp. 53-54). Dr. Gillilan testified that a significant factor was that Mr. Ross's descriptions of his alleged levels of intoxication were inconsistent. ( Gillilan, p. 72). The letter declining to proceed against M.K. identified nine principal reasons for the determination. Mr. Ross agreed at his deposition that Dr. Gillilan's letter accurately cited the facts developed in the investigation. (Ross, pp. 74-75). He agreed it was reasonable for Mr. Shoup and Dr. Gillilan to conclude he was not incapacitated based upon his own prior description of his level of sobriety. (*Id*., pp. 87-88).

Dr. Gillilan's August 11 letter also declined to pursue discipline against M.K. for allegedly withholding text messages during the investigation. Because this allegation did not involve sexual

misconduct, it was not within the purview of the Title IX office or Mr. Shoup's investigation.  It

alleged a violation of a more general provision of the Student Code and, as such, was subject to an

investigation directly by Dr. Gillilan's office. (Gillilan, p. 55).  The substance of Dr. Gillilan's

conclusion was that the Final Report issued in Mr. Ross's case included all the questioned texts, that

they had all been produced, and that any issues about whether or not M.K. had lied or withheld

information had been previously presented to the Hearing Board in Mr. Ross's case and rejected. (*Id*.,

Ross Dep. Ex. "O", pp. 2-3).  Mr. Ross did not appeal the decision to not proceed with his case.

    Mr. Ross transferred to the University of Kentucky and matriculated for the fall semester

2016.  He graduated from there on time in the spring of 2019. (Ross, pp. 8-9).

    The Ross case was one of fifty-two (52) such Title IX investigations conducted by the

University between the fall semester 2012 and the fall semester 2018. In forty-seven (47) of those

matters, the complainants were female and the respondents male. In three (3) complaints, both the

complainant and the  respondent were male. In one (1) case, a male filed a complaint against a female.

In the final case, the complainant was a transgender male and the respondent a female. Of these

investigations,  Dr. Gillilan reviewed the investigative report and dismissed twelve (12) of them for

insufficient evidence to warrant further disciplinary proceedings. Of the remaining forty (40)

complaints,  seven (7) respondents admitted responsibility or accepted the sanctions proposed without

adjudication; thirty (30) cases were adjudicated; and three (3) matters were still pending at the time the

data was accumulated.  The SMB[3] found the respondent responsible in twenty-seven (27) of the cases,

---

[3] In a few matters, the respondent was determined to be responsible after the Title IX office's
investigation but did not go to an SMB hearing and accepted the imposed sanctions without admitting
guilt.  For simplicity, those are considered adjudications of responsibility.

and not responsible in seven (7) cases.[4]   Of those cases where respondent was found responsible for

violating the Sexual Misconduct Policy, either by admission or adjudication, nineteen (19) were

suspended, ten (10) were expelled, and five (5) received a lesser sanction such as restricted interaction

with complainant, removal from campus housing, probation, and/or educational courses. (Def.'s S.J.

Ex. F, Defendant's Answer to Plaintiff's Interrogatory No. 5 and attached chart).

### III.    Statement of Material Facts Not in Dispute
### Pursuant to L.R. 56.1

1.   In 2015, Plaintiff Adam Ross was a freshman student at Ball State University.

2.   "Jane Doe," or "M.K." was also a freshman student at Ball State in 2015.

3.   During orientation, incoming freshmen are provided instruction on the University's

     Sexual Misconduct Policy and provided a link to detailed documents on Ball State's

     website concerning the subject.

4.   Adam Ross and M.K. met at freshman orientation and developed an acquaintance.

     They were in the same History class and shared notes and studied together.

5.   Ball State has a policy regarding sexual misconduct on campus, "Sexual Harassment

     and Misconduct Policy," Appendix K to the Code of Student Rights and

     Responsibilities. Appendix K contains detailed definitions of terms applicable to its

     subject matter, as well as a description of potential actions or dispositions within its

     scope. It also provides a detailed explanation of the procedures applicable to

---

[4] Two matters involved multiple respondents, so while 30 complaints were adjudicated, those involved 34 respondents.

adjudicatory hearings of allegations of sexual misconduct.

6.  Ball State's Title IX Coordinator in 2015 was Katie Slabaugh.  Assistant Dean of Students Dr. Tiffany Peters, Mr. Jeff Shoup, and Ms. Lauren Berger, amongst others, served as Title IX investigators when complaints were received regarding violations of the Sexual Harassment and Misconduct Policy on Ball State's campus.  Dr. Michael Gillilan served as Director of Student Rights and Community Standards during this same timeframe.

7.  The role of Title IX investigators like Peters, Berger, and Shoup was to conduct interviews of witnesses with knowledge, gather documentary evidence, and otherwise assemble facts for decisions to be made by others.

8.  The role of Dr. Gillilan was to review the facts  gathered by the investigators and determine if they evidenced a violation or violations of the University's Sexual Misconduct Policy (or other provisions of the Student Code) and, if so, to initiate disciplinary proceedings.

9.  On September 18, 2015, Adam Ross and M.K. had an encounter that resulted in the filing of a sexual misconduct charge against Adam Ross (the "Ross charge").

10. On November 9, 2015, after M.K. decided to come forward with her complaint, an investigation was opened by Ball State's Title IX office and Dr. Tiffany Peters and Ms. Lauren Berger were assigned to handle the investigation.

11. Ms. Berger and Dr. Peters conducted the following interviews:

    a.  November 13, 2015 "M.K."

    b.  November 18 2015 "J.G." (M.K.'s roommate)

14

    c.   November 20, 2015 Adam Ross

    d.   November 20, 2015 Mr. Ross's mother

    e.   November 23, 2015 "M.K." follow-up

    f.   November 23, 2015 T.K., brother of M.K.

    g.   November 24, 2015 Jenna Clemens (counselor to M.K.)

12. On December 3, 2015, Ms. Berger and Dr. Peters reviewed the interviews and the evidence that had been provided and created a Final Report which summarized their findings and the areas where complainant and respondent agreed or disagreed. Mr. Ross agreed that the summary of his statements prepared by the investigators was accurate.

13. This Final Report was first provided to Mr. Ross and M.K. for review and comment, and then was forwarded to the Director of the Office of Student Rights and Community Standards, Dr. Michael Gillilan, who reviewed the report and issued his determination to charge Plaintiff with violations of the Student Code.  Plaintiff was notified of this decision by letter dated  January 14, 2016.

14. Plaintiff, via his legal counsel, then made arrangements to give another interview and the following interviews were held by Dr. Peters and Ms. Berger:

    a.   February 3, 2016 Adam Ross follow-up

    b.   February 19 and 26, 2016 "M.K." follow-up

15. On February 25, 2016, Dr. Gillilan issued a letter confirming his initial determination to charge Mr. Ross for sexual misconduct. Mr. Ross was given the opportunity to deny the charges and request a hearing or to accept responsibility for the violations.

16. On March 24, 2016, the parties were notified that a Ball State University Sexual Misconduct Board ("SMB") adjudicatory hearing was scheduled for March 30 and outlined the procedures for it.

17. The letter advised Mr. Ross of the identity of the members of the Sexual Misconduct Board that would hear the charges against him and adjudicate his case. Mr. Ross knew of no reason why these Board members would be biased against him, nor did he contend they were inadequately trained.

18. On March 30, 2016 a hearing was held by the SMB regarding the Ross charge.

19. Mr. Ross reviewed and understood the procedures for the hearing as outlined in Appendix K. He appeared and offered evidence, as did M.K. Mr. Ross was accompanied by his attorney, acting as his advisor.

20. Mr. Ross acknowledged that in his hearing and the procedures prior to it that Ball State followed the procedures outlined in Appendix K.

21. Ross was found guilty of sexual misconduct and suspended from Ball State for two (2) years.

22. Dr. Gillilan modified the SMB's recommendation for immediate suspension to allow Mr. Ross to complete his spring semester.

23. Mr. Ross appealed the SMB's finding to Dr. Alan Hargrave, Associate Dean of Students, who reviewed the appeal and issued a letter of denial.

24. Mr. Ross then filed a sexual misconduct allegation on May 6, 2016 against M.K. for the same encounter on September 18, 2015. (the "Ross charge").

25. The investigation of the Ross charge was assigned to Jeff Shoup, a different Title IX

investigator who had no role in the first case. Mr. Shoup is employed by Ball State as Assistant Director of Housing and Residence Life.

26. Mr. Shoup conducted an investigation and held additional interviews, issuing a Final Report on July 20, 2016 which was then reviewed by Dr. Gillilan.

27. On August 11, 2016 Mr. Ross was informed by a letter from Dr. Gillilan that after his review of the evidence, the charge against M.K. did not warrant further action.

28. No SMB hearing was held on the Ross charge.

29. Investigators employed by Ball State attend training seminars both in house and elsewhere.  This training covers topics such as working with victims of sexual misconduct, interviewing techniques, Clery Act reporting, legal and moral responsibilities towards accused students, sexual assault and disabilities, and generalized Title IX training.

30. Ms. Lauren Berger had completed five (5) hours of training prior to investigating the Ross charge.

31. Dr. Tiffany Peters had completed more than 60 hours of training at the time of the Ross charge.

32. Eight complaints of sexual misconduct between students for non-consensual sexual contact or intercourse were filed with BSU's Office of Title IX compliance during the 2015-2016 school year.  Of those eight complaints, six were female complainants against male accused (including M.K.'s charge).   One was a male complainant against a female accused (the Ross charge), and one was a male complainant against a male accused.  Seven of those investigations proceeded to adjudication and five of the

17

accused students were found responsible by the board, with sanctions that ranged from restricted contact to a recommendation of expulsion.  The male complainant-male accused case resulted in the accused being found responsible and suspended.

33. The SMB is comprised of faculty and professional employees of Ball State who undergo annual comprehensive, and specialized training in order to hear sexual harassment or misconduct cases.  At each hearing, three SMB members comprise the hearing panel.

34. Prior to the hearing, the SMB members review the investigative report, witness statements and relevant documentary evidence.

35. SMB hearings are led by a Chairman, one of the three SMB members, who follows a specific script of procedure, a copy of which is attached as Def.'s S.J. Ex. "G-1".

36. The script is gender neutral in all references to complainant and accused.

37. The script followed at the SMB hearing on the Ross Charge is attached as Def.'s S.J. Ex. "G-2."

38. The procedure followed by the SMB allows both sides to be present at the hearing, provide evidence and testimony, have equal access to the information to be presented at the hearing, and being allowed the advisor of their choice.

39. Disciplinary hearings before the SMB are recorded. A transcript of the March 30, 2016 hearing of the charge against Mr. Ross is Def.'s S.J. Ex. G-3.

### IV.    Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).

The moving party must inform the court "of the basis for its motion" and specify evidence

demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986).  Once the moving party meets this burden, the nonmoving party must "go beyond the

pleadings" and identify "specific facts showing that there is a genuine issue for trial."  *Id*. at 324.  In

ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable

to the non-moving party and draw[s] all reasonable inferences in that party's favor."  *Zerante v.

DeLuca*, 555 F. 3d 582, 584 (7th Cir. 2009) (citation omitted).


## V. Argument

### 1. Defendant is entitled to summary judgment because Plaintiff cannot show that he was intentionally discriminated against because of his gender and thus his claim under Title IX fails as a matter of law.

Title IX prohibits intentional gender-based discrimination by educational institutions that

receive federal funds.  A claim such as Plaintiff has brought in this case requires proof of "intentional

discrimination because of sex."  *Doe v. Indiana University*, 2019 U.S. Dist. LEXIS 12966 at *24 (S.D.

Ind. January 28, 2019) quoting *Ludlow v. Northwestern Univ.*, 125 F. Supp.. 3d 783, 793 (N.D. Ill.

2015).  Plaintiff's burden is to show that gender was a motivating factor in an erroneous decision to

impose discipline.  *Ayala v. Butler Univ.*, 2018 U.S. Dist. LEXIS 179806 at *20 (S.D. Ind. October 19,

2018); King v. DePauw Univ., 2014 U.S. Dist. LEXIS 117075 at *27 (S.D. Ind. August 22, 2014).

Cases through the years have identified or described and attached labels to various evidentiary

paths that a plaintiff may use to attempt to meet this burden.  In a recent opinion, the Court of

Appeals collapsed these methodologies into a simple formula:  "[D]o the alleged facts, if true, raise a

plausible inference that the university discriminated against [the Respondent] 'on the basis of sex'[?]" *Doe v. Purdue Univ.*, 928 F. 3rd 652, 667-668 (7th Cir. 2019).  See also *Doe v. Columbia College*, 2019 U.S. App. LEXIS 24053 at *8 (7th Cir. Aug. 13, 2019).  The Plaintiff must establish a causal connection between his discipline and an intentional gender bias.  *Ludlow*, 125 F. Supp. at 792.

In this case, Plaintiff's Complaint is rich with allegations:  "[Ball State's]  policies fail to meet the standards required by Title IX" (Complaint, Para. 44);  "Defendant created an environment in which male students accused of sexual misconduct, such as Ross, are fundamentally denied due process" (*Id.*, Para. 45);  "Defendant failed and/or refused to provide Ross the same protection in his complaints against (M.K.) as those that were afforded to her" (*Id.*, Para. 49).

Mr. Ross's deposition, however, is devoid of facts to support these claims.  On summary judgment, a plaintiff must produce evidence to support the elements of his claim and may not rest on his allegations.  As the Court of Appeals has stated, it is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus.*, 325 F. 3d 892, 901 (7th Cir. 2003).

It is apparent from a review of Ball State's procedures for reporting, investigating, and adjudicating claims of sexual misconduct that those policies are completely gender-neutral (Ross, pp. 58-65; Dep. Ex. I, "APPENDIX K"; SMB Board script, Def.'s S.J. Ex. G-1).  The factual history detailed in the Final Reports of investigators Peters, Berger, and Shoup all detail that their investigations were thorough and complete, interviewing all witnesses with knowledge (or reviewing their prior statements) and collecting documentary evidence, like text messages.  All parties were allowed to review the draft final reports before they were forwarded to Dr. Gillilan, and they were allowed to make or suggest corrections.  Even though Ball State's investigation of M.K.'s complaint

20

was ostensibly finished when Dr. Gillilan wrote Mr. Ross on January 14, 2016 (Ross Dep. Ex. "D") to inform him of the decision to proceed with charges, the rules or procedures were suspended in Mr. Ross's favor to allow him to make a statement and for that to be included in an amended Final Report. Mr. Ross was allowed to have his attorney present for that statement and at all other phases of the proceedings.

Mr. Ross agreed that the summary of that interview prepared by Dr. Peters and Ms. Berger was accurate. (Ross, p. 34). He agreed he reviewed the hearing procedures in APPENDIX K and that he understood his rights. (*Id.*, p. 37). He admits he had no information that the members of the hearing board were either biased or lacked training. (*Id.*, p. 38-39). He alleged the investigators were not adequately trained, but admitted that the Supervisor, Dr. Tiffany Peters, had between 50 and 60 hours of training at the time of his investigation. (*Id.*, pp. 42-43). He persisted in maintaining that even that was not enough training but could not articulate a basis for that statement other than his own self-serving opinion, which is not evidence. (*Id.*).

Mr. Ross admitted that Ball State followed the detailed hearing procedures outlined in APPENDIX K. (*Id.*, p. 65). He agreed that the difference between his version of events and M.K.'s version was like a "he said -she said" dispute, and that in such a case the statement of a third party like M.K.'s roommate's testimony that she heard M.K. saying "no" would have a potentially dispositive impact on the trier of fact. (*Id.*, p. 58).

In the sexual misconduct proceedings, Mr. Ross was attempting to prove M.K. consented to the sexual contact. In this case, however, his burden is different. It is, as outlined previously, to present facts that create a genuine issue as to an outcome-determinative material fact. In this setting, that means a fact or facts that demonstrate or would support at least a reasonable inference of gender

bias infiltrating the investigation and/or the hearing process that resulted in discipline. In his deposition, the only fact Mr. Ross identified was his contention that when he listened to tapes of the investigators questioning M.K., he believed their "tone" toward M.K. was different than their tone when they questioned him when he gave his statement. (*Id.*, pp. 44, 47-48). Mr. Ross summed up his opinion this way:

> Q: So anything other than your opinion that the tone of how they recorded [M.K.'s] statements demonstrated a bias? Any other facts that you can identify for me that you believe indicated a bias on behalf of the investigators?
>
> A: Besides under-training, not that I can think of off the top of my head.
>
> (*Id.*, p. 49).

Mr. Ross agreed that a difference in tone of voice, or a more gentle touch, toward M.K. may simply reflect that such an approach may be necessary when an investigator is dealing with a victim. (*Id.*, p. 45).[5] If anything, this is evidence of a bias in favor of victims of sexual assault, not proof of gender discrimination. See, e.g. *Doe v. Columbia College*, 299 F. Supp. 3d 939, 955 (N.D. Ill.) (St. Eve, J.) (allegations that a panel member questioned a male respondent more aggressively than the alleged victim "at best" showed a bias in favor of sexual assault complainants and against those accused of sexual assault, regardless of gender). See also, *Ayala*, 2018 U.S. Dist. LEXIS 179806 at *21; *Doe v. Miami Univ.*, 247 F. Supp. 3d 875, 888 (S.D. Ohio 2017).

---

[5] With regard to the potential impact of an alleged difference in tone of voice, we deem it important to note that Dr. Gillilan receives the written summaries and makes his decision based upon the written record and does not listen to the tapes. (Gillilan, pp. 10, 20). The investigators about whose "tone" Plaintiff complains were just fact finders who prepare written reports, not decision makers. One may peruse both of those reports, Exhibit 2 to the Declaration of Dr. Peters and the report of Mr. Shoup (Ross Dep. Ex. M) and there is no evidence of a gender bias in the content or manner in which they were written. Mr. Ross agreed the investigators fairly summarized his statements (Ross, pp. 34, 62). At the hearing, the Sexual Misconduct Board has the actual Complainant and Respondent present to testify and does not rely on any alleged "tone" used by the investigators.

Nothing in Plaintiff's evidence supports his complaint allegations that Ball State's Title IX policies, or how the case against him was handled, were motivated by a gender bias.  Like the plaintiff in *Doe v. Indiana Univ.*, 2019 U.S. Dist. LEXIS 12966 at *33, ["Plaintiff's] arguments simply consist of his desire to have different or additional procedures in place to handle sexual misconduct investigations, hearings, and determinations.  His arguments exhibit his disagreement with weighing evidence and making credibility determinations.  However, his arguments do not show gender discrimination or bias."  The same holds true in this case.

Mr. Ross also contends that the fact that his complaint against M.K. was not also taken through the SMB adjudicatory process somehow evidences a gender bias.  Yet he agreed that Ball State followed its policies in conducting that investigation (Ross, pp. 71-73).  He also agreed that he had no evidence that Mr. Shoup was biased (*Id.*, pp. 78-79).  He testified that Dr. Gillilan's letter identifying the reasons he was not going to pursue the charge was supported by the evidence. (*Id.*, p. 74; Dep. Ex. "O").  And he agreed that it was reasonable for both Mr. Shoup and Dr. Gillilan to conclude he was not incapicitated during his encounter with M.K. in light of his own earlier statements to Dr. Peters and Ms. Berger that he was not intoxicated. (*Id.*, pp. 87-88).

Mr. Ross's allegation of differential treatment of his complaint against M.K. is simply more of the same.  He makes no colorable argument of any gender bias infiltrating the investigation and disposition of that complaint. He just desires a different result.

Despite the obvious contradiction in Mr. Ross making a charge alleging he was a victim due to incapacitation (only three months after telling investigators he was sober during his encounter with M.K.),  Ball State nevertheless diligently followed its procedures and investigated this subsequent complaint.  In less than thirty days after the unsuccessful disposition of his appeal, Mr. Ross totally

23

reversed field from saying he was a sober individual who knew what he did and did not do to M.K., to then making a claim that he was so intoxicated he must have been incapacitated.  Given the depth of the first investigation and the obvious inconsistencies in his subsequent complaint, the University would have been justified in simply declining the complaint upon receipt.  However, it did not.  It assigned Mr. Shoup, a Title IX investigator unfamiliar with any of the facts of the previous case, to give them a fresh look.  Mr. Shoup then wrote a thirty-seven page report, and Dr. Gillilan properly declined to proceed further but wrote a painstakingly detailed letter to Plaintiff explaining why.

Plaintiff has wholly failed to identify any evidence that remotely suggests that he was investigated or disciplined because he is a male.  This Court should grant summary judgment against Mr. Ross and in favor of Ball State on Count One of the Complaint.

### 2.  Plaintiff's state law claims are barred by the 11th Amendment

The remaining two counts in Plaintiff's Complaint allege violations of state law: Count Two, which alleges a breach of contract, and Count Three, which alleges negligence. However, both of these claims are subject to dismissal because Ball State University is an institution of higher education created by acts of the Indiana Legislature and thus a state agency. A suit against Ball State is the equivalent of a suit for damages against the State of Indiana.

The Eleventh Amendment precludes suits for damages against the states in federal courts on the basis of the States' "sovereign immunity."[6] This preclusion is based on the court's subject matter jurisdiction. *Sissom v. Purdue Univ.*, 207 Fed. Appx. 715, 716 (7th Cir. Ind. 2006); *Kashani v. Purdue*

---

[6] The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The Supreme Court extended the reach of the Eleventh Amendment beyond citizens of *other* States to include suits by citizens of the *same* State. *Edelman v. Jordan*, 415 U.S. 651, 662-63, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974).

*University*, 813 F.2d 843, 845 (7th Cir. 1987) ("jurisdictional bar"); *Shannon v. Bepko*, 684 F. Supp. 1465, 1470 (S. D. Ind. 1988).[7]

Ball State University is a state-supported institution of higher education, created and funded by the Indiana General Assembly. Ind. Code §§21-23 et seq.. *See,  McCullough v. IPFW*, 2013 U.S. Dist. LEXIS 20224 (2013), *3. For purposes of lawsuits filed in federal court, Ball State *is* the State of Indiana. It is thus immune from lawsuits in federal court. *E.g.*, *Pierick v. IUPUI*, 510 F.3d 681, 695 (7th Cir. 2007); *Williamson v. Indiana University*, 345 F.3d 459, 464 (7th Cir. 2003)("state universities are entities that are considered part of the state for § 1983 analysis."); *Kashani v. Purdue University*, 813 F.2d 843, 844-845 (7th Cir. 1987); *Bull v. Bd. of Trustees of Ball State Univ.,* 2011 U.S. Dist LEXIS 147774 at * 11 ("The Eleventh Amendment prohibits the Court from adjudicating state-law claims where, as here, the state agency objects"); *Swartz v. Scruton*, 964 F.2d 607, 608 (7th Cir. 1992) (case properly dismissed against Ball State Board of Trustees as "an arm of the State of Indiana").

This doctrine was recently applied in this District by Judge Pratt in a Title IX student discipline case to dismiss a pendent state law breach of contract claim against Indiana University. See, *Doe v. Indiana Univ.-Bloomington,* 2019 U.S. Dist 12966 at *22-*24. In that opinion, the Court observed that abundant case law recognized Indiana University as an alter ego of the State of Indiana, much like the federal cases cited above in which the same was held to be true for Ball State University. The Court quoted *Edelman v. Jordan*, 415 U.S. at 662-663 for the proposition that the Supreme Court "has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of other states." Although with regard to some federal

---

[7] In *Indiana Protection and Advocacy Services v. Indiana Family and Social Services Admin.*, 603 F.3d 365, 370 (7th Cir. 2010) the court noted that the Eleventh Amendment is "unusual" for a jurisdictional defense in that it is "waivable" if not asserted. Ball State asserts the defense here and does not waive it.

statutes, such as Title VII of the Civil Rights Act of 1964, Congress has specifically abrogated Eleventh

Amendment Immunity, it has not done so with regard to claims brought pursuant to Title IX. Ball

State respectfully submits that both of Plaintiff's state law claims should be dismissed on the basis of

Eleventh Amendment immunity.

### 3. Defendant is entitled to summary judgment because the implied-in-fact contract created between student and University was not breached; Ball State complied with all procedures as set forth in the University's Code of Student Rights and Responsibilities and its Sexual Harassment and Misconduct Policy

Under Indiana law, the relationship between a student and an educational institution is

contractual in nature.  *Sung Park v. Ind. Univ. Sch. of Dentistry*, 692 F. 3d 828, 831 (7th Cir. 2012)

quoting *Neel v. Ind. Univ. Bd. of Trustees*, 435 N.E. 2d 607, 610-611 (Ind. Ct. App. 1982).  "It is

generally accepted that the catalogues, bulletins, circulars and regulations of the university made

available to the matriculant are part of the contract."  *Amaya v. Brater*, 981 N.E. 2d 1235, 1240 (Ind.

Ct. App. 2013); *Ross v. Creighton Univ.*, 957 F. 2d 410, 416 (7th Cir. 1992).  Indiana courts, however,

take "a very flexible approach to the scope of contractual promises" and do not apply them

"mechanically where the principal is an academic institution and the result would be to overturn an

academic determination."  *Chang v. Purdue Univ.*, 985 N.E. 2d 35, 46 (Ind. Ct. App. 2013).  This rule

applies in university disciplinary determinations.  *Id*.

In his Complaint, Mr. Ross alleges that Ball State "improperly and unlawfully applied its

policies in part by not affording Ross rights to which he is entitled."  (Complaint, Para. 56).  When

cross-examined, however, Mr. Ross could only identify two complaints or reasons he thought the

process as applied to him was unfair - his perception of an improper tone of voice on the part of the

investigators and "under-training."  Mr. Ross could offer no facts for why he considered fifty to sixty

hours of training (Dr. Peters) to be "under trained." He simply compared the training he thought was necessary to be a Title IX Investigator to the work it takes to be a professor. He stated: "Let's put it this way, if you put in, what was it, 50 to 60 hours of work in college, does that make you a professor?" (Ross, p. 43). Such an opinion does not create a genuine issue of fact.

More to the point, Ball State's Sexual Misconduct Policy in APPENDIX K provides for investigations and hearings to proceed in a certain fashion. Mr. Ross had a contractual right to expect that, and he testified the rules were followed. (Id., pp. 31, 33-34, 37-39, 49, 53, 58-66, 71-73). Mr. Ross was entitled to the rights and procedures spelled out in APPENDIX K, and he testified he received them. There is no merit in this state law breach of contract claim. Ball State is entitled to judgment as a matter of law as to Count Two of Plaintiff's Complaint.

### 4. Defendant is entitled to summary judgment on Plaintiff's negligence claim because there is no legal duty owed to students by universities relating to the implementation of disciplinary proceedings

Whether a duty exists is a question of law for the Court. *Estate of Heck v. Stofer*, 786 N.E. 2d 265, 268 (Ind. 2003). The existence of a duty springs in part from the relationship between the parties. *Webb v. Jarvis*, 575 N.E. 2d 992 (Ind. 1991). The existence of a duty is an element of negligence. *Id*. Typically, a special relationship must exist between the parties before the law imposes a duty which, if breached, may give rise to a claim of negligence. *Westminster Presbyterian Church of Muncie v. Cheng*, 902 N.E. 2d 859, 866 (Ind. Ct. App. 2013); *Stockberger v. United States*, 225 F. Supp. 2d 949, 961 (S.D. Ind. 2002).

In *Doe v. Columbia College*, 299 F. Supp. 3d 939 (N.D. Ill. 2017) (then) District Judge Amy St. Eve rejected a Title IX Plaintiff's attempt to allege a count of negligence as one of his claims arising from his contention that he was wrongfully disciplined for sexual assault and that the university did

not properly apply its policies. Because of the precise application of that opinion to the attempt by

Mr.Ross in this case to allege a claim of negligence, we extensively quote from Judge St. Eve's opinion:

> In *Austin v. University of Oregon*, 205 F. Supp. 3d 1214, 1229
> (D. Or. 2016), for example, a group of male students alleged
> that they were wrongfully disciplined for sexual misconduct
> and asserted a negligence claim against their university based
> on its allegedly flawed disciplinary process.  The court rejected
> their negligence claim finding that the university did not owe a
> duty to students accused of sexual assault because they did not
> have the required special relationship and because the
> university's goal was to reach just code of conduct decisions
> rather than protect the interests of any particular student.  Id.,
> Similarly, in *Doe v. Amherst College*, 238 F. Supp. 3d 195, 228
> (D. Mass. 2017), Amherst College expelled a male student for
> violating the university's sexual misconduct policy and the
> student brought a Title IX claim as well as a negligence claim
> based on allegedly biased disciplinary proceedings.  The court
> rejected his negligence claim because the university did not
> have a legal duty "be owed directly to students, relating to the
> implementation of student disciplinary proceedings." Id. *See
> also Doe v. Trustees of Boston Coll.*, No. 15-CV-10790 2016 WL
> 5799297, at *28 (D. Mass. Oct. 4, 2016) (rejecting negligence
> claim for unfair disciplinary proceedings relating to sexual
> assault because university does not owe duty of care to
> students in relation to disciplinary proceeding)s.

> Instead of address this case law, Doe merely asserts that CCC
> had a duty based on its policies, and cites to one case, *Dawson
> v. United States*, No. 16-CV-00827, 2017 WL 977822, at *1
> (S.D. Ill. Mar. 14, 2017).  *Dawson*, however,  is not applicable
> in this case because it involved a hospital's duty of care for its
> patients and the court in that case did not consider a
> university's duty to its students.  Here, based on Illinois
> precedent, as well as the persuasive case law from other
> jurisdictions discussed above, the Court finds that CCC does
> not have a "special relationship" with its students such that a
> duty arose to protect Doe from the harmful acts of third
> parties, such as Roe and her friends.  *See, e.g., Freeman v. Busch*,
> 349 F. 3d 582, 587-88.  The Court also finds that CCC does
> not owe a duty to its students "relating to the implementation
> of student disciplinary proceedings." *Amherst Coll.*, 238 F.
> Supp. 3d at 228; *see also Rabel*, 514 N.E. 2d at 560 (university
> policies do not create duty towards students).

299 F. Supp. 3d at 962-963.

As the *Doe* case in the Northern District of Illinois, and cases collected in the opinion, make clear, allegations of irregularities in student discipline cases and theories of common law negligence don't mix. Plaintiff has not alleged any facts that make this case an exception to that rule, and his testimony is that BSU followed its rules. Assuming for the sake of argument that BSU had any duty, arguably a duty to follow its internal rules, Mr. Ross has not offered any facts showing that it breached that duty.

Summary judgment should be entered for Ball State and against Mr. Ross on Count Three of his Complaint.

## VI. Conclusion

Ball State respectfully requests summary judgment be entered on its behalf and against Plaintiff. There are no material facts in dispute, Plaintiff has failed to demonstrate any evidence of gender bias by Ball State, and Ball State complied with all its policies and procedures regarding disciplinary proceedings; thus, Ball State is entitled to judgment as a matter of law.

Respectfully submitted,

**DeFUR ● VORAN LLP**
By: /s/ Scott E. Shockley
Scott E. Shockley, Atty. No. 2153-18
Maura J. Hoff, Atty. No. 25475-49-A
400 S. Walnut Street - Suite 200
Muncie, IN 47305
Telephone: (765) 288-3651
Facsimile: (765) 288-7068
sshockley@defur.com
mhoff@defur.com
**ATTORNEYS FOR BALL STATE**

<u>CERTIFICATE OF SERVICE</u>

I certify that on August 23, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States District Court, Southern District of Indiana, Indianapolis, by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Brett Errol Osborne
HOCKER & ASSOCIATES LLC
6626 E. 75th St.
Suite 410
Indianapolis, IN 46250

<u>/s/  Scott E. Shockley</u>
Scott E. Shockley