UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ADAM ROSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-01258-JRS-TAB |
| | ) | |
| BALL STATE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**Order on Motion for Summary Judgment**

Adam Ross was a freshman at Ball State University ("Ball State" or the "University") in the fall of 2015, when he was accused by M.K., another student, of sexual assault after the two engaged in what she claims were non-consensual sexual relations. Ball State conducted an investigation, which resulted in Ross's two-year suspension for violating the University's sexual misconduct policy. Ross commenced this action against Ball State, alleging a violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq.*, breach of contract, and negligence. Ball State has filed a Motion for Summary Judgment on all claims. The Court decides as follows.

## I. Factual Background

Ross enrolled at Ball State as a freshman in the fall semester of the 2015–16 academic year. While at summer orientation he had met M.K., who was also a freshman that year. They became friends but did not date. (Ross Dep. 12-13, ECF No. 40-2.) Ross was given information during orientation about Ball State's sexual misconduct

policies. (*Id*. 15-16, ECF No. 40-2.)  He understood that forcing oneself sexually upon another was prohibited.  (*Id*.)

During the evening on Friday, September 18, 2015, Ross consumed five shots of rum over a two-hour period.  (Ross Dep. 17-18, ECF No. 40-2.)  Ross testified that that amount of alcohol in that amount of time did not make him intoxicated; he believes he would have had to take five shots in about an hour to become intoxicated.  (Ross Dep. 21, ECF No. 40-2.)

A few hours after Ross had stopped drinking, he and M.K. texted and agreed to go for a walk on campus.  (Ross Dep. 19, 21, ECF No. 40-2.)  M.K. asked Ross up to her dorm room because she was concerned that he had been drinking and that he could get in trouble out on campus.  (Ross Dep. 22, ECF No. 40-2; Tiffany Peters Decl. ¶ 12, ECF No. 40-16 at 5.)  Ross slept while M.K. and her roommate worked on their computers for a while.  M.K. and her roommate retired at 1:00 a.m.  Ross awakened and began making advances toward M.K.  She told him "no" several times, and he stopped.  (Peters Decl. ¶ 12 & Ex. 1 at 4, ECF No. 40-16 at 5.)  M.K.'s roommate overheard M.K. saying "no" and asked her if she needed help, but M.K. said that Ross was just being drunk and stupid.  (*Id*.)  Ross went back to sleep.

Around 3:00 a.m., Ross woke up, tried to kiss M.K. and began touching her inappropriately.  She told him "no," but he did not stop.  He then got up, paced around, and sat back down.  He grabbed M.K. by the wrists and began kissing her again.  He pulled her pants down and digitally penetrated her.  (Peters Decl. ¶ 12 & Ex. 1 at 4-5, ECF No. 40-16.)  M.K. began to shake and cry; Ross stopped and tried to calm her down. (*Id*. at 5.)  They fell asleep.  Two hours later, M.K. was awakened by Ross lifting her leg and partially inserting his penis into her vagina.  M.K. was afraid to move or cry out.  After a few minutes, Ross stopped, got up, and left.  (*Id*.)

M.K. reported to her roommate that Ross had assaulted her.  (Peters Decl. ¶ 12 & Ex. 1 at 5, ECF No. 40-16.)  M.K. purchased a morning-after contraceptive pill. (*Id.*) Later that morning, Ross texted M.K., apologizing: "I'm sorry about last night" and "I feel incredible bad and I promise it will never happen again."  (Ross Dep. Ex. A, ECF No. 40-3.) M.K. texted back that she was going to get "Plan B" because she "woke up during the last part of that," and Ross texted a reply: "I didn't think I put it in I swear."  (*Id.*)

M.K. was conflicted about what to do.  She hoped Ross would apologize, and she did not want him to get in trouble. (Peters Decl. ¶ 12 & Ex. 1 at 6, ECF No. 40-16.) M.K. eventually decided to report the assault and did so.  The matter was reported to Ball State's Title IX compliance office on November 9, 2015.  (Peters Decl., Ex. 2, ECF No. 40-16 at 1.)

Ball State has policies and procedures for investigating and adjudicating matters of alleged sexual harassment and misconduct.  The "Code of Student Rights and Responsibilities APPENDIX K - Sexual Harassment and Misconduct Policy," is a written guide to its procedures. (Ross Dep. 37 & Ex. I, ECF Nos. 40-2 & 40-8.)  The policy sets forth procedures for reporting misconduct and investigation, through adjudication. (Ross Dep., Ex. I, ECF No. 40-8.)  The policy provides that upon receipt of a complaint, the University's Title IX Coordinator will conduct a review, determine if immediate measures are necessary for the well-being of the complainant, and determine whether an investigation is warranted. (*Id.* 21–23.)  The Title IX Coordinator reviewed M.K.'s complaint against Ross, determined an investigation was warranted, and assigned two Title IX investigators, Tiffany Peters and Lauren Berger, to conduct the investigation. (Peters Decl. ¶ 5, ECF No. 40-14.)  The Coordinator also referred the matter to Michael Gillilan, Ball State's Director of Student Rights and

Community Standards, to issue a "no contact" letter restricting Ross from having any contact with M.K. (Michael Gillilan Dep. 7-9, ECF No. 40-18; Ross Dep. 28 & Ex. B, No Contact Letter of Nov. 16, 2015 from Gillilan to Ross, ECF No. 40-2 & 40-4.)

The investigators, Peters and Berger, interviewed M.K. on November 13, 2015, and again on November 23, 2015. They completed a twelve-page report of the interviews, including copies of text messages. (Peters Decl. ¶ 12, ECF No. 40-14; Final Report, Peters Decl., Ex. 2 at 3-15, ECF No. 40-16.) The investigators also interviewed M.K's roommate who reported having heard M.K. say "no, no, no, no, no" several times and observing Ross trying to do things to her. The roommate stated that they all had fallen asleep, and she awakened to arguing and M.K. crying. The roommate also reported that after Ross had left, M.K. told her that "he raped me." (Final Report 19–21, Peters Decl., Ex. 2, ECF No. 40-16.)

The investigators interviewed Ross on November 20, 2015, in the presence of his attorney and parents. Ross declined to talk about the night in question, asserting his Fifth Amendment right against self-incrimination. The summary of the interview was provided in three pages of the investigator's final report. (Final Report 16–18, ECF No. 40-16.) The investigators also interviewed Ross's mother about conversations she had had with Ross and M.K.; M.K.'s brother, who had interactions with Ross after the incident; and the counselor to whom M.K. first reported the sexual assault and who served as a confidant to M.K. in the days thereafter, and the investigators summarized these interviews in their report. (Final Report 23–26, 39–40, ECF No. 40-16.)

Peters and Berger prepared a draft Final Report. Under Ball State's procedures, such a draft, including the interview reports and documentary evidence, is shared with the complainant and respondent. (Ross Dep., Ex. I, ECF No. 40-8 at 26.) That

4

procedure was followed with respect to M.K.'s complaint against Ross. (Ross Dep. 30, ECF No. 40-2; Gillilan Dep. 14, ECF No. 40-18; Peters Decl.¶ 10, ECF No. 40-14.) As the procedures require, the Report was submitted to Gillilan for review and a preliminary determination of whether the Sexual Misconduct Policy was violated and whether further adjudication was warranted. (Gillilan Dep. 13, ECF No. 40-18, Ross Dep., Ex. I at 27, ECF No. 40-2.) Gillilan made the determination that Ross had violated the Sexual Misconduct Policy and alcohol prohibitions, and informed Ross of his determination in a January 14, 2016 letter. (Gillilan Dep. 60, ECF No. 40-18; Ross Dep. 32 & Ex. D, ECF No. 40-5.) The letter summarized the evidence that caused Gillilan to find that the complained-of events had occurred and that they were non-consensual and to recommend a two-year suspension. (ECF No. 40-5.) Gillilan requested a prompt meeting to discuss the matter and informed Ross of his right to a hearing and option to accept responsibility. (Ross Dep., Ex. D at 3, ECF No. 40-5.)

After receiving the letter, Ross requested an opportunity to provide a statement of his version of the events to the investigators. The investigation was technically closed, but it was reopened to permit Ross to provide a statement. (Peters Decl. ¶ 11, ECF No. 40-14.) Peters and Berger interviewed Ross on February 3, 2016, with Gillilan and Ross's attorney present. Ross admitted to sexual contact with M.K. by digital penetration, but asserted that the encounter was consensual. (Peters Decl., Ex. 2, ECF No. 40-16.) Ross stated that he was not drunk during the encounter, and that if "10" was "blacked-out drunk" and "1" was "buzzed," he "was probably a three," a condition he referred to as "a little buzzed but under drunk." (Ross Dep. 21–23, 86–87, ECF No. 40-2; Peters Decl., Ex. 2, Final Report at 46, ECF No. 40-16.) Ross's interview was summarized in a twenty-four-page addendum to the Final Report. (Peters Decl. ¶ 12 & Ex. 3, Final Report at 45–68, ECF No. 40-17.) Ross testified that

5

the addendum accurately represented what he had told the investigators. (Ross Dep. 34, ECF No. 40-2.)

Gillilan reviewed the additional evidence and decided to proceed as outlined in his January 14, 2016 letter. He wrote Ross on February 25, 2016 to inform him of that decision and again advised him of his right to a hearing or the option to accept responsibility. (Ross Dep. 35, ECF No. 40-2.) A formal notice of an evidentiary hearing and advisement of rights followed on March 24, 2016. (Ross Dep. 35–36, ECF No. 40-2.) Ross reviewed the hearing procedures and understood his rights. Before the hearing, he was informed of the names of the Sexual Misconduct Board members who had been selected to hear the matter. Ross had no reason to believe that any member of the Board would not be fair to him or was unqualified to serve on the Board. (Ross Dep. 37–39, ECF No. 40-2.)

The Sexual Misconduct Board hearing was held. The hearing procedures set forth in the Sexual Misconduct Policy were followed. (Ross Dep. 58–65, ECF No. 40-2.) Ross did not call any witnesses to testify on his behalf. (*Id.* at 52–53.) After the conclusion of the hearing, the Board decided that Ross was responsible for a violation of the University's Sexual Misconduct Policy and recommended a sanction of a two-year suspension. (*Id.* at 66.)

On March 31, 2016, Gillilan wrote Ross to inform him of the Board's findings and summarized the evidence. (Ross Dep., Ex. J, ECF No. 40-9.) This included the fact that M.K. stated that she had asserted "no" to Ross's advances multiple times throughout the night, which statement was corroborated by her roommate, and that both M.K. and Ross agreed there was never verbal consent. The Board also found that the text messages corroborated M.K.'s statements. Because of the proximity to the end of the spring semester, Gillilan modified the effective date of Ross's

6

suspension to allow him to complete the term. (*Id.*) Ross was advised of his right to appeal the decision. Ross appealed, and he had the opportunity to make all the arguments he wanted to on appeal. His appeal was denied. (Ross Dep. 66, ECF No. 40-2.)

After the proceedings against him were concluded, Ross filed, on May 6, 2016, his own complaint of sexual misconduct against M.K., claiming that he had been incapacitated by alcohol intoxication during the sexual encounter on September 19, 2015 and that he was incapable of giving consent. (Ross Dep. 67–68; 72-73, ECF No. 40-2.) Ross also alleged that during the prior investigation, M.K. had lied and withheld additional text messages between her and Ross. (*Id.*; Ross Dep., Ex. L, ECF No. 40-11.)

Ball State's Title IX office assigned the investigation of Ross's complaint to Jeff Shoup, a Title IX investigator and Assistant Director of Housing and Residence Life. (Jeff Shoup Dep. 6–7, 11, ECF No. 40-19.) On May 25, 2016, Shoup met with Ross and his mother to interview Ross about the complaint. The interview was summarized in seven pages of Shoup's Final Report. (Ross. Dep., Ex. M, Final Report, 3-8, ECF No. 40-12.) On June 22, 2016, Ross was interviewed again in the presence of his mother and his attorney. This second interview was also summarized in another seven pages of Shoup's Final Report. (Ross Dep., Ex. M, Final Report 8–14, ECF No. 40-12.) In the course of his investigation, Shoup reviewed Ross's prior statements to Peters and Berger from the first investigation and summarized them in his Final Report. (*Id.* 14–28, ECF No. 40-12.)

Shoup decided whom to interview based on Ross's sexual misconduct complaint and statements. He attempted to interview M.K., but she declined, and referred him to the interviews she had already given. Shoup documented his summary of those

7

prior interviews in his Final Report. (*Id.*, Final Report, 28-34, ECF No. 40-12.) Because Ross did not report contact with M.K.'s roommate, Shoup did not interview her. (Shoup, Dep. 14-19, ECF No. 40-19.)

Shoup completed his thirty-seven-page Final Report on July 20, 2016. (Shoup Dep. 28–29, ECF No. 40-19; Final Report, Jeff Shoup, 7/20/2016, Ross Dep. Ex. M, ECF No. 40-12.) Shoup's Final Report included sections identifying the sexual contact/consent policies at issue as well as the definition of incapacitation in the policies:

> Where alcohol or other drugs are involved, incapacitation is defined with respect to how the alcohol or other drugs consumed affect a person's decision-making capacity, awareness of consequences, ability to make informed judgments, the capacity to appreciate the nature and quality of the act, or level of consciousness. In other words, a person may be considered unable to give effective consent due to incapacitation if the person cannot appreciate the "who, what, when, where, why and/or how" of a sexual interaction.[1]

(Ross Dep., Ex. M, Final Report 35–37, ECF No. 40-12.) Incapacitation is a state beyond "under the influence." (*Id.* at 35.) Shoup provided a written analysis of the facts from his investigation. (Ross Dep., Ex. M, Final Report 36, ECF No. 40-12.) Citing Ross's prior statements to the investigators about his level of sobriety, Shoup found "it does not appear as though [Ross] was intoxicated at the time of the sexual contact that he believes was non-consensual." (*Id.* at 37, ECF No. 40-12.) Ross had based his complaint on M.K.'s statement that when she first saw Ross that night, he was very drunk, arguing that he therefore must have been too intoxicated to give effective consent. (ECF No. 40-12 at 1.) Shoup's analysis observed that the sexual contact at issue occurred hours later, in the middle of the night, when M.K. described Ross as considerably more sober. (*Id.* at 37, ECF No. 40-12.)

---

[1] Page 35 is missing from the copy of the Final Report filed with the Court, ECF No. 40-12. However, Ross has not disputed that Ball State's brief accurately states the definition of incapacitation.

8

Shoup's Final Report was provided it to Ross to review. (Shoup Dep. 28–29, ECF No. 40-19; Final Report, Jeff Shoup, 7/20/2016, Ross Dep. Ex. M, ECF No. 40-12.) Ross made corrections and additions. (ECF No. 40-2.) Ross testified that he could not identify any policy that Ball State did not follow in the investigation. (Ross Dep. 65, ECF No. 40-2.) He also testified that he had no evidence that Shoup was biased against him, and Ross could not identify any action that Shoup, as the investigator, should have taken, but did not. (Ross Dep. 78–79, ECF No. 40-2.)

Shoup's Final Report was sent to Gillilan, who wrote Ross a letter on August 11, 2016, to advise him that there was insufficient information for his complaint of sexual misconduct against M.K to proceed to the adjudication phase of the investigation. (Ross Dep. 24 & Ex. O, ECF Nos. 40-2 & 40-13.) Gillilan's letter identified nine principal reasons for his decision not to proceed with Ross's complaint. (Ross Dep., Ex. O, ECF No. 40-13.) Ross agreed that Gillilan's letter accurately cited the facts developed in the investigation. (Ross Dep. 74–75, ECF No. 40-2.) Ross further agreed that it was reasonable for Shoup and Gillilan to conclude, based on his own prior statements to Berger and Peters in February 2016 about his level of sobriety, that Ross was not incapacitated. (*Id.* 87–88, ECF No. 40-2.)

Gillilan's letter declined to pursue discipline against M.K. for allegedly withholding text messages during the investigation, reasoning that the allegation did not fall within the scope of the investigation because it did not involve sexual misconduct. (Gillilan Dep. 55 & Ex. O, ECF Nos. 40-18 & 40-13.) Gillilan also determined that whether M.K. lied or withheld information had been presented to the Sexual Misconduct Board in the adjudication of M.K.'s complaint against Ross, and the Board found Ross, not M.K., responsible for sexual assault. (Ross Dep. Ex. O, ECF No. 40-13.) Ross did not appeal the decision not to move his complaint to the adjudication phase.

9

## II. Discussion

As an initial matter, the parties agree that Ross's state law claims for breach of contract and negligence should be dismissed based on Eleventh Amendment immunity. Nonetheless, Ross asserts that Ball State has never indicated that it did not consent to his state claims being heard along with his Title IX claims in this case. (Pl.'s Resp. Opp'n 7, ECF No. 46.) Yet Ball State asserted immunity in its Answer, which was filed June 21, 2018. (Answer, Aff. Defense ¶ 10, ECF No. 12.)

Ball State argues that it is entitled to summary judgment on Ross's Title IX claims because Ross was afforded due process, and the process is not discriminatory as to males. Ball State also argues that Ross has no evidence of gender bias in the University's investigative or adjudicative process. Ross responds that the facts when viewed in the light most favorable to him raise a reasonable inference that Ball State discriminated against him based on his sex.

Summary judgment should be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court examines the facts in the light most favorable to the non-movant and draws all reasonable inferences from the evidence in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008) (quoting *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004)).

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); *see also Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979) (interpreting Title IX to provide an implied right of action). To prevail on a Title IX discrimination claim, a plaintiff must show that the educational institution discriminated against him based on gender. *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019); *see also Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019) (stating that a plaintiff must "show that sex was a motivating factor in the university's decision to discipline [the] student").

Ross argues that several facts raise an inference that Ball State discriminated against him on the basis of his sex and preclude summary judgment: (1) Ross testified under oath that he was incapacitated on the night of the incident; (2) his text-message apology was not for alleged sexual misconduct, but rather for being intoxicated around M.K.; (3) Ball State never disclosed to him that the November 23, 2015 interview of M.K. was recorded and did not transcribe that recording but merely provided a summation of the interview; (4) he was not provided the opportunity to listen to the recording of the interview before his hearing with the Sexual Misconduct Board; (5) the Sexual Misconduct Board was not provided a copy of the recorded interview or a verbatim transcript of that interview; (6) neither investigator Gillilan nor Shoup reviewed the actual recording before making a decision; (7) Ball State's policies or procedures did not prohibit the University from providing the actual

recording of an interview to the Sexual Misconduct Board members or to him; (8) Gillilan participated in the February 3, 2016 interview of Ross; (9) Shoup testified that if any recordings were made during the investigation, that should be noted in the final report; (10) Shoup interviewed only Ross with respect to Ross's claim against M.K.; (11) according to Ross, after having listened to the recorded interview of M.K., the Summation in the Final Report was "just completely different" and the context of M.K.'s statements are lost in the Summation; and (12) listening to the recorded interview would have been helpful to the Sexual Misconduct Board.  (Pl.'s Resp. 3–4, ECF No. 46.)  None of these facts would permit a reasonable inference that Ball State discriminated against Ross because of his sex in connection with the proceedings and adjudication of M.K.'s sexual assault charge against him, or in connection with the procedures for investigating his subsequent charge against her.

Ball State's policy and procedures for investigating and adjudicating allegations of sexual harassment and misconduct are gender neutral.  The policy and procedures were followed with respect to M.K.'s complaint against Ross.  (Ross Dep. 58–65, ECF No. 40-2.)  In fact, Ball State even reopened its investigation after its completion to allow Ross to give his statement.  Because the matter had already progressed to the stage where Gillilan had made a preliminary determination that Ross had violated the Sexual Misconduct Policy, it is not surprising that Gillilan was present at Ross's subsequent interview on February 3, 2016.  And nothing about Gillilan's presence suggests a bias based on sex.  Indeed, Ross has admitted that Ball State followed the procedures for investigating and adjudicating sexual misconduct claims with respect

to M.K.'s complaint against him. Ross also agreed that in such a case, testimony of a third-party such as M.K.'s roommate would have an impact on the Board hearing his case. (Ross Dep. 58, ECF No. 40-2.) And Ross had no reason to believe that any member of the Sexual Misconduct Board would be unfair to him.

Although Ross testified under oath at his deposition that on the night of the encounter with M.K. he was incapacitated and so drunk that he did not realize how drunk he was, (Ross Dep. 68, 69, 73, ECF No. 46-3), his deposition was taken on June 4, 2019, (Ross. Dep., ECF No. 40-2), years after he had told investigators Peters and Berger that he was not intoxicated during the sexual encounter with M.K. While M.K. also said that Ross was intoxicated, and so much so that she invited her to his room to sober up, there is no dispute that Ross's subsequent assertions of being incapacitated and drunk contradict his earlier statements to Peters and Berger. Also, even if intoxicated initially, both investigations noted a number of hours had passed before the sexual contact at issue. Anyway, in conducting his investigation of Ross's complaint against M.K., Shoup was aware of Ross's contradictory statements and took them into account in deciding whether Ross's complaint should move to the adjudication phase. (Final Report, Jeff Shoup, 7/20/2016, Ross Dep., Ex. M, ECF No. 40-12.) And, as noted, Ross agreed that it was reasonable for Shoup and Gillilan to conclude that Ross was not incapacitated during the sexual encounter.

Ross claims that Ball State never disclosed to him that the November 23, 2015 interview of M.K. was recorded and even testified that during the proceedings against him, he had no idea that a recording existed. (Ross Dep. 81, ECF No. 46-3.) However,

13

the record reveals otherwise.[2] The transcript of the Sexual Misconduct Board hearing reflects that in response to a question from Ross about how the case was investigated, the lead investigator Berger said that "all of our interviews are recorded." (3/30/2016 Sexual Misconduct Board Hr'g Tr. 7, ECF No. 40-23.) In addition, Ross had the opportunity at the hearing to submit questions to be asked of M.K., and the Board members had the opportunity to observe her manner and demeanor while testifying before them. (3/30/2016 Sexual Misconduct Board Hr'g Tr. 9–10, ECF No. 40-23.)

Nothing in Ball State's policies and procedures required it to transcribe the recording of M.K.'s interview. While the policies and procedures did not *prohibit* the University from providing the actual recording of the M.K. interview to the Sexual Misconduct Board members or to Ross as the respondent, nothing in its policies and procedures *required* that either the recording or a verbatim transcript be provided to the Board or Ross. Nor did the policies and procedures mandate that the investigators, Gillilan and Shoup, listen to the actual recording before making a decision. Providing a summation of the interviews to the respondent, the investigators, and the Board members, as Ball State did with respect to M.K.'s complaint against Ross as well as with respect to Ross's complaint against M.K., (Gillilan Dep. 14, ECF No. 40-18; Shoup Dep. 15–16, ECF No. 40-19), was consistent with Ball State policy and procedures—even if listening to the recorded interview would have been helpful.

According to Ross, the summation of M.K.'s interview in the Final Report was "completely different" and the context of M.K.'s statements were lost in the

---

[2] Ross has not identified any policy that required Ball State to inform him that the interview had been recorded. Even assuming a policy required disclosure, Ball State made the disclosure here.

14

summation. (Ross Dep. 47, 81, ECF No. 46-3.) Ross stated that when M.K. was explaining saying "No, no, no," "it was like a playful 'No, no, no.'" (Ross Dep. 81, ECF No. 46-3.) However, Ross could not identify any factual inconsistency between the actual recording and the summation. (*Id.* at 81–82.) At worst, Ross may have identified a bias in favor of alleged sexual assault victims and against the accused. But such a bias does not suggest a bias against males. *See, e.g., Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 955 (N.D. Ill. 2017) (concluding that allegations the college's disciplinary and investigative procedures were unfair to the accused "are not indicative of gender bias against males").

Even assuming that Ross's text-message apology was not for alleged sexual misconduct, but rather for being intoxicated around M.K., (Ross Dep. 25, ECF No. 40-2), this fact fails to reasonably suggest that Ball State discriminated against Ross based on his sex.

Ball State also followed its policy and procedures for investigation and adjudicating Ross's sexual misconduct complaint against M.K. Ross agreed that Ball State followed its policies and procedures in conducting its investigation and could identify no policy that Ball State failed to follow. (Ross Dep. 58–59, 65, 73, ECF No. 40-2.) Although Ross alleges that "only a cursory investigation was done," (ECF No. 46), the evidence shows that was not the case. Despite the fact that Ross's claim against M.K. directly contradicted his prior statements during the investigation of M.K.'s complaint, Shoup investigated Ross's complaint, including interviewing Ross and reviewing the prior case, and made findings in a thirty-seven page report. Ross testified

15

that he had no evidence that Shoup was biased against him, and Ross could not identify any action that Shoup, as the investigator, should have taken, but did not take. (Ross Dep. 78–79, ECF No. 40-2.)

Finally, Ball State's Sexual Misconduct Policy requires a "state beyond 'under the influence'" to show incapacitation. (Ross Dep., Ex. M, Final Report 35, ECF No. 40-12.) Ross ultimately agreed with the conclusion reached by both Shoup and Gillilan—Ross agreed that it was reasonable for them to conclude, based on Ross's prior statements to Berger and Peters in February 2016 about his level of sobriety, that he was not incapacitated at the time of the sexual encounter with M.K. (Ross Dep. 21–23, 86–88, ECF No. 40-2.) Besides, at the March 30, 2016 hearing before the Sexual Misconduct Board, Ross repeatedly stated that the sexual encounter was consensual. (3/30/2016 Hr'g at 10–12, 15, 17, ECF No. 40-23.)

Although Shoup interviewed only Ross with respect to Ross's claim against M.K., (Shoup Dep. 19–20, ECF No. 40-19), Shoup decided whom to interview based on Ross's complaint and statements. Shoup attempted to interview M.K., but she declined and referred him to the prior interviews she had given. Shoup explained that he did not contact M.K.'s roommate because Ross did not report any contact with her. Ross testified that he had no evidence that Shoup was biased against him. And Ross could not identify any action that Shoup, as the investigator, should have taken, but did not. (Ross Dep. 78–79, ECF No. 40-2.) Therefore, the fact that Shoup interviewed only Ross in his investigation fails to raise a reasonable inference of discrimination based on sex.

Ross argues that Ball State proceeded with respect to M.K.'s complaint and his complaint "in a gender biased manner" because each party made a complaint "against

16

the other on nearly the same basic set of facts, but with each respective party being treated in different manners, both in their respective capacity as victim and accused." (Pl.'s Resp. 5, ECF No. 46.) Even though both complaints arose out of the "same basic set of facts" about the incident, Ross's subsequent complaint against M.K. arose in a very different context. His complaint contradicted multiple statements he had given in the investigation of M.K.'s complaint, and M.K.'s version of the facts was supported by her roommate's statements.

In summary, the evidence in the record, even when viewed in the light most favorable to Ross, is insufficient to permit a reasonable inference that Ball State's investigation or adjudication of M.K.'s sexual misconduct complaint against Ross was because of his sex. The evidence is similarly insufficient with respect to the investigation of Ross's subsequent sexual misconduct complaint against M.K.—a complaint entirely inconsistent with Ross's prior statements that the sexual encounter was consensual and he was not drunk, just "a little buzzed" during the encounter as well as with his agreement that the conclusion he was not incapacitated during the sexual encounter was reasonable. The very same University policies and procedures that were applied to M.K.'s complaint were applied to Ross's complaint. They simply resulted in different outcomes. Given the record, including the fact that Ross's complaint contradicted the very statements he had made earlier and that M.K.'s version was supported by her roommate's statements, whereas Ross's version was not supported by any third party, the difference in adjudication does not raise a reasonable inference of gender bias. Ross and M.K. simply were *not* "in the exact same positions,"

17

(Pl.'s Resp. 6, ECF No. 46), whether as complainants or respondents. Therefore, summary judgment should be granted to Ball State on Ross's Title IX claim.

## Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 38) is **granted**. Ball State is entitled to judgment on Ross's Title IX claim (Count I) and the breach of contract and negligence claims (Counts II and III) are **dismissed without prejudice** to refiling in state court. Final judgment will be entered.

**SO ORDERED.**

Date: 3/4/2020

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana


Distribution to all parties of record via CM/ECF.